988

BAILEY et al. v. PORTER et al.
No. 45C, 1919.

United States District Court
N. D. Illinois, E. D.
June 10, 1947.

George B. Craven and Edward J. Mc-Laughlin, both of Chicago, Ill., for plaintiff.

John T. Chadwell, Richard M. Keck, and Howell B. Hardy, all of Chicago, Ill., for defendant.

BARNES, District Judge.

### Findings of Fact

The Court adopts the following as its findings of fact on the evidence and pleadings in the above entitled cause:

1. The defendant co-partnership of Sanderson & Porter operated the Elwood Ordnance Plant, Elwood, Illinois during the period in question in this suit under a cost-plus-a-fixed-fee contract with the War Department of the United States Government. The plaintiffs were employed by Sanderson & Porter for varying periods of time in the Inspection Department at the Elwood Ordnance Plant.

2. The plant was used for the assembling of artillery shells, bombs and other items of munitions and loading the same with TNT and other explosives for the use of the Armed Forces of the United States.

3. The plant site was a military reservation approximately 23 square miles in area. There were numerous entrance gates leading into the plant for all kinds of traffic and there were interwoven roads and railroads throughout the whole plant area. The intra-plant railroad trackage aggregated approximately 110 miles. There were numerous loading lines, warehouses, magazines, and other necessary buildings, facilities and equipment. There were 1100 structures on the premises. The number of employees fluctuated from approximately 13,000 to 5,000.

The entire plant, including all buildings, machinery, equipment and facilities, was owned at all times by the United States Government. The Government procured, owned and furnished to Sanderson & Porter all TNT, powder and other component parts used in the assembling and loading of munitions at the plant. Sanderson & Porter procured and received material and supplies shipped on bills-of-lading from various consignors to Sanderson & Porter, as consignees, from without the State of Illinois. Title to such supplies vested in the Government at the time of delivery thereof at the plant site and upon inspection and written acceptance thereof by the War Department. Shells, bombs, and other items of munitions produced at the plant were inspected by the Government inspectors, and if the same were approved as meeting Government specifications, approval tickets were given Sanderson & Porter. All munitions produced at the plant were shipped out from the plant upon orders received by the Commanding Office from the War Department in Washington, specifying the type and quantity to be shipped and the destination, method and route of shipment. All outgoing shipments were made by rail with the excep-

tion of certain ballistic samples shipped by motor carrier. Railroad cars and trucks were loaded by employees of Sanderson & Porter. The railroad cars were moved from the loading point over the intraplant railroad system by Sanderson & Porter employees to the plant railroad classification yard, maintained and operated by Sanderson & Porter, at which point the cars were picked up by commercial railroads. All outbound shipments were made by the Government on Government bills-of-lading specifying the Commanding Officer of the plant as the consignor and the Commanding Officer of another Army facility as the consignee. A substantial portion of said munitions was so shipped to points located outside of the State of Illinois.

4. The plant was divided into general areas known as the Loading Line Area, the Fuse and Booster Area, and the High Explosive and Inert Storage Areas.

The Loading Line Area consisted of four separate loading lines or groups in which shells, bombs, and land mines were loaded with TNT and other high explosives. Each group or loading line consisted of a chain of buildings widely separated for safety reasons and connected with covered ramps.

The Fuse and Booster Area consisted of six separate loading lines or groups in which fuses, boosters, detonators primers, and other component parts of shells and bombs were assembled and loaded with high explosives. Each line or group consisted of a number of buildings, all of which were widely separated for safety reasons.

The Inert Storage and High Explosive Storage Areas consisted generally of widely separated warehouses and igloos in which component parts and finished ammunition were stored for varying periods of time. These areas covered a very large acreage and for safety reasons the warehouses and igloos were widely separated.

5. The defendants maintained as a separate department or division of the Elwood Ordinance Plant an Inspection Department, the function of which was to inspect all ammunition produced at the plant to insure that the same was produced in accordance with loading instructions and specifications furnished to the defendants by the Ordinance Department of the Army. The number of personnel employed in the Inspection Department ranged from 267 to 679. The Inspection Department was headed by a Chief Inspector who was directly assisted by an administrative assistant known as the Assistant Chief Inspector and by three assistants known as Division Inspectors who exercised general supervision over the inspection activities in major plant areas.

6. The plaintiffs were employed in the Inspection Department as Senior Inspectors and Supervising Inspectors. The principal employment of the plaintiffs as Senior Inspectors and Supervising Inspectors was in the Loading Line and Fuse and Booster Areas, although a small number of the plaintiffs were employed in similar capacities in the Inert Storage and High Explosive Storage Areas. The Senior Inspectors were responsible for the supervision of all inspection activities carried on in a particular loading group or area during all three shifts. They were present at the plant only during the day shift but were generally responsible for the inspection activities carried during the other two shifts. The inspection activities on each particular shift in each group or area were under the supervision of a Supervising Inspector who had direct responsibility for supervising and directing the work of the line inspectors who were non-exempt hourly paid employees.

7. The inspection activities of the non-exempt line inspectors who were supervised by the Senior and Supervising Inspectors consisted generally of a one hundred per cent inspection of assembling and loading operations. The line inspectors were assigned by the Supervising and Senior Inspectors to inspection stations along the production lines and throughout the storage areas where they performed both visual and gauge inspections of various types.

8. The primary duties of each of the plaintiffs consisted of the management of a customarily recognized department or subdivision of the Elwood Ordinance Plant; the plaintiffs customarily and regularly directed the work of other employees whom they supervised; the suggestions and rec-

ommendations of the plaintiffs as to the hiring or firing and as to the advancement and promotion or any other change of status of the employees whom they supervised were given particular weight; the plaintiffs customarily and regularly exercised discretionary powers; the plaintiffs were compensated for their services on a salary basis which ranged from a minimum of $55 to a maximum $70 per week (exclusive of board, lodging, or other facilities); the plaintiffs did not perform duties of the same nature as those performed by the line inspectors whom they supervised for any considerable amount of time and the plaintiffs' hours of work of the same nature as that performed by the non-exempt inspectors did not exceed twenty per cent of the number of hours worked in the workweek by the non-exempt inspectors under their direction.

### Conclusions of Law

The Court adopts the following as its conclusions of law on the evidence, pleadings and findings of fact in this case:

1. The Court has jurisdiction of the subject matter of this suit under the provisions of Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b).

2. The Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., was in full force and effect during the entire period of time involved in this suit.

3. During all of the period in controversy in this suit the defendants operated the Elwood Ordinance Plant under a cost-plus-a-fixed-fee contract with the United States Government. The defendants were not an agency of the United States Government but, as provided in said cost-plus-a-fixed-fee contract, were independent contractors.

4. During all of the period in controversy in this suit, the defendants engaged in the manufacture or processing of munitions for the United States Government intended for shipment in interstate commerce.

5. During all of the period in controversy in this suit the plaintiffs were employed by the defendants in the Inspection Department of the Elwood Ordinance Plant. The plaintiffs' work was necessary to the production of goods to be transported in interstate commerce within the definition of "commerce" as contained in the Act, 29 U.S.C.A. § 203(b).

6. During all of the period in controversy in this suit the munitions manufactured or processed by the defendants for the United States Government were "goods" within the definition of "goods" as contained in the Act, 29 U.S.C.A. § 203(i).

7. Each of the plaintiffs while employed by the defendants at the Elwood Ordnance Plant as a Senior Inspector and/or Supervising Inspector was at all times an "employee employed in a bona fide executive * * * capacity" within the meaning of Section 13(a) (1) of the Fair Labor Standards Act of 1938 as such term is defined and delimited by regulations of the Administrator, Wage and Hour Division, U. S. Department of Labor, and hence the overtime compensation provisions of Section 7 of said Act were not applicable to plaintiffs.

8. The Court finds the issues for the defendants and against the plaintiffs and directs that judgment be entered dismissing plaintiffs' amended complaint on the merits with costs to defendants.