## ANDERSON et al. v. FEDERAL CART-RIDGE CORPORATION.

### Civil Action No. 1109.

District Court, D. Minnesota,
Fourth Division.
June 12, 1947.

------◆------

See also 72 F.Supp. 644.

Frank P. Ryan and E. R. Maetzold, both of Minneapolis, Minn., for plaintiffs.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for the defendant.

NORDBYE, District Judge.

The eight plaintiffs—Alvin A. Fjeldstad, Walter B. Holt, Hans P. Schleicher, Harold E. Weber, William H. Eddy, Jr., Robert C. Oen, James L. Sanders, and Raymond Sinna—are individual claimants in a so-called class action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., and for the convenience of Court and counsel these cases were consolidated for trial. In the interest of an expeditious dispatch of this litigation, I have concluded to dispose of these cases with a brief memorandum rather than a lengthy decision. The views reflected hereafter, however, are my conclusions after carefully considering the evidence and scrutinizing and weighing all the testimony offered in behalf of the claimants and the defendant. The record reflects the usual conflict encountered in the testimony in the hearing of these wage claims. However, there is only presented one factual question in all of the cases, except as to the claims of James L. Sanders. It is stipulated that Sub-sections (A), (B), (C), (D), and (E) of Section 541.1 of the Regulations covering executives are met by the evidence. We are only concerned with Sub-section (F) of the Regulations, and that is whether the claiments spent more than twenty percent of their time doing work which was the same kind of work as that done by non-exempt employees. As to Sanders, there is the additional question as to whether he was exempt from July, 1943, to March, 1944, as an administrative employee.

Plaintiffs Alvin A. Fjeldstad, Walter B. Holt, Hans P. Schleicher, and Harold E. Weber were employed as chemists in the Metallurgical Control Laboratory Department. Fjeldstad was a Chemist No. 2 and a Chemist No. 3; Schleicher was also a Chemist No. 2 and a Chemist No. 3; Holt and Weber were both Chemists No. 2. Fjeldstad makes no claim for the period he was employed as a Chemist No. 3.

The claims of Holt and Weber will be first considered. There were usually four girls in the laboratory and each Chemist No. 2 had this number of employees to supervise. There were three shifts. The Chemists No. 2 supervised all activities and personnel of one shift. When components were annealed, pickled, washed and dried before the first draw operation and between subsequent drawing operations, the Control Laboratory tested the material to see that the required standards were established. Samples were taken from time to time and tested, etched with acid, and examined under the microscope for grain size. The acid used in the annealing machines was tested. Samples of completed cartridges were tested for cracks in the metal by the application of a mercury solution. Rockwell tests were performed. Lacquer which was applied to the tips of

the bullets was also tested. The materials in the brass cups were tested and gauged for inside and outside diameter and thickness. During a part of the time, at least, considerable time was spent by some of the Chemists No. 2 in testing paints which were applied to the cans in which the ammunition was packed. Undoubtedly much of this work was routine, and after the girls became acquainted with their duties, they went ahead without much supervision. I am convinced from the evidence that the Chemists No. 2 did much of this routine testing. Some of them spent considerable time in gauging material. Because they had relatively few employees under their supervision, they did much of the same work as the laboratory technicians. One witness, Marion Wardell, called by the plaintiffs, and who impressed the Court as an intelligent witness, stated that Mr. Holt would sometimes spend from three to five hours a day in gauging. Carlton H. Hughes, a witness called by the defendant, and who was a supervisor of the Control Laboratories, stated that he hesitated to call a Chemist No. 2 a foreman by reason of the limited number of employees who were engaged in the laboratories, and that he thought that a Chemist No. 2 was more properly designated as a working foreman. Alice Nelson, a witness called by the plaintiffs, and who also impressed the Court as an intelligent and truthful witness, stated that Weber sometimes spent five hours a day doing nothing but gauging. No doubt a fair amount of supervisory work was done by both Holt and Weber. But as to these two men I am reasonably free from doubt that the work performed by them consisted of performing substantially the same routine tests as those performed by the laboratory technicians and that this routine work was performed by them to an extent which exceeded twenty per cent of their work week of forty-eight hours.

Substantially the same situation existed when Fjeldstad and Schleicher were employed as Chemists No. 2. To a large extent they performed the same routine tests as those performed by the laboratory technicians. Much of the work of the laboratory technicians pertained to the testing of components which went through the annealing machines. Samples had to be taken from these machines from time to time and subjected to the various tests which are necessary. Fjeldstad and Schleicher performed Rockwell tests, the hot etch test, examined the metal under a microscope, and in addition to their supervisory duties undoubtedly carried on their work to a large extent in the same way as their subordinates. In that Fjeldstad has waived any claim with reference to overtime when he was employed as a Chemist No. 3, no further discussion is necessary as to that period. The only real problem presented is with reference to Schleicher's claim for overtime after he became Chemist No. 3 in the Spring of 1944. He has not waived any claim for that period and he contends that he combined the duties of Chemist No. 2 with Chemist No. 3. He states, however, that after he became Chemist No. 3 his supervisory duties increased. In his written statement to the company relating to his duties and responsibilities, dated September 8, 1944, he stated that he was responsible for twelve employees—two Chemists No. 2 and ten laboratory technicians. He stated that his supervisory work required sixty per cent of his time, performing the same duties as the employees under his supervision, five to ten per cent of his time, and that the remainder of his time was spent "regulating flow of materials through annealing furnaces, and checking irregularities in various production operations." In a similar report dated January 24, 1945, in answer to the question, "Do you perform any work of the same nature as that performed by the employees under your immediate supervision?" he answered "No." He now contends that he minimized the routine work that he performed as Chemist No. 2 in order to obtain a salary increase from his employer. In other words, as he expressed it in substance, he thought a bird in the hand was worth two in the bush, and in that he wanted a salary increase he thought he would take a chance on his contemplated claim for overtime compensation. Certainly, he lulled his employer into believing that he was an exempt employee, and while some consideration should be given for honest mistakes in estimating the relative time devoted to super-

visory work and routine work, Schleicher's explanation seems entirely devoid of fairness or even common honesty. On the witness stand, Schleicher stated that one-third of his time as Chemist No. 3 was spent in doing work of the same kind as the other employees in the Control Laboratories. As Chemist No. 3, he was receiving $69.60 per week, and later, presumably due in part to his own representations as to the supervisory work that he was performing, his salary was increased to $75.20 per week. This weekly wage was substantially the same as that received by Fjeldstad. I am constrained to find on all the evidence, and in light of Schleicher's own written appraisal of the portion of his time devoted to routine work at the time when the work was being done by him and when his knowledge and recollection of the allocation of his duties between supervisory work and routine work should be far better than it is at this time, that he should be limited in his recovery for overtime to the period when he was employed as a Chemist No. 2, and that his claim should be denied for the period when he was rated and was paid a salary which compensated him for his duties performed as a Chemist No. 3.

■ As to Raymond Sinna, there is no doubt in my mind that his claim for overtime should be denied. He was an assistant general foreman in the Roads and Grounds Department of the Maintenance Division. The time that he spent in doing nonexempt work was inconsequential. In his own handwriting under date of July 20, 1943, he characterized his work as that of "supervising of repair of roads and walks, moving of temporary buildings, repair of water lines drainage, placing of culverts and reshaping of roads." The evidence fully sustains a finding that the work he did consisted of supervising various types of jobs which he enumerated in the statement referred to.

■ In February, 1943, James L. Sanders was a supervisor in charge of General Stores, Perishable Tools, Spare Parts, and Maintenance Tool Cribs for all three shifts. There were as high as twenty employees under him and subject to his supervision.

In addition, there were at times four employees in the office under his supervision. Various items, such as grinding wheels, safety glasses, mops, maintenance items, etc., were handled by the Stores Department. Then there was the Spare Parts Department and the Maintenance Tool Cribs. The tools were handed to the employees at the beginning of the shift and returned at the close thereof. Spare parts were given out on requisitions. When the quantity became low, they had to be replenished. Undoubtedly Sanders did certain work in the tool cribs and may have checked items and taken inventories, and in divers ways was required to handle tools and parts in performing his work as a foreman. But it seems quite clear that when he performed work of this nature it was incidental to his duties as the supervisor of the department. Obviously, he had to perform many duties which might seem routine on the surface and comparable to those which the other employees performed, but the very nature of the department and the supervision thereof required daily contact with, and the listing and handling of, various tools, parts, etc. He had his desk in a special room allocated to him. A stenographer was available to him, and all the employees in the department took their orders from him and looked to him as their superior. His contention that he spent one-half of his time performing work of the same nature as that performed by his subordinates is not sustained by the evidence and the defendant has fairly sustained the burden imposed upon it in this regard. After July 1, 1943, and to the date of termination of his employment in March, 1944, Sanders became an assistant to the Superintendent, and the clear weight of the evidence is that in performing the various duties allocated to him he was an administrative employee within the meaning of the Regulations. Therefore, it is my finding that the claim of James L. Sanders must be in all things denied.

■ The two remaining claimants are William H. Eddy, Jr., and Robert C. Oen. Between April, 1942, and September, 1942, Eddy was a shift foreman in the Anneal, Pickle, Wash and Dry Department. There

were from twenty to twenty-five persons under his supervision. Eddy contends that he shoveled components into the furnaces, adjusted the belts, changed the temperature of the furnaces when necessary, cleaned up around the machines, lit the furnaces, adjusted the baffle plates, cleaned up scrap, and moved trucks up to the furnaces. Moreover, he states that he relieved the operators of the furnaces at lunch and rest periods. His testimony in this regard is not satisfactorily rebutted by the testimony offered by the defendant. While there may be some question as to whether or not he did spend more than twenty per cent of his time in performing work of the same nature as that performed by the non-exempt employees in his department, I am contrained to find that he was to a substantial extent a working foreman and that the defendant has failed to sustain the burden of proof during this period to bring Eddy within Sub-section (F) of Section 541.1 of the Regulations. Therefore, during this period when he was a shift foreman in the Anneal, Pickle, Wash and Dry Department between April and September, 1942, his claim for overtime should be allowed.

This brings me to a consideration of Eddy's claim for overtime from September, 1942, to September, 1943, when he was a foreman in the I. B. Charge Department, and Oen's claim for overtime from March, 1942, to September, 1943, as foreman in the Tracer Charge Department. In the I. B. Department when it was finally set up, there were some twelve machines and some sixty to eighty employees. Eddy was in charge. Certainly, he could not be classed as a working foreman. His primary duty was to supervise the entire working force. There were generally from five to six girls to a machine, and then there were some four or five adjusters whose duties were to repair the machines and to keep them in good working order. No doubt Eddy helped adjust the machines at times, especially when the adjusters had trouble and were unable to solve the difficulty, or if an emergency arose. But such work was more or less incidental to his duties as foreman. The very fact that he was a foreman of this important department pre-

sumes that he would step in when necessary to render assistance if there was danger of a break-down. Moreover, it is clear that at times he may have assisted in cleaning up the department and performing other nonexempt work, but a competent foreman would not be expected merely to walk up and down the aisles with his hands behind his back barking out orders to his subordinates. The very nature of his duties as a supervisor would require him to help out from time to time in an emergency, or when it might be necessary for him to lend a hand in order to keep his department from bogging down, but he was not assigned or directed to any nonexempt work. When he took it upon himself to assist any nonexempt employee, he did so of his own volition and incidental to his duties as foreman. It must be emphasized that his primary duty was to supervise and oversee a very important department engaged in highly secretive and dangerous work. The cleaning up around the machines, or even the walls, in order to prevent a fire or some explosion was not necessarily a departure from his work as a foreman of the department. Certainly, under these circumstances it is not the intent of the Wage and Hour Act that casual departures from strict supervisory work should be meticulously added together in order to determine whether an executive may have exceeded the twenty per cent maximum referred to in Sub-section (F) of Section 541.1 of the Regulations, and particularly when it fairly appears that the foreman in performing such work did so as incidental to, and in furtherance of, his work as supervisor. The fact that a man is qualified to be a foreman and to supervise the work of some eighty people presupposes that he has enough intelligence and enough interest in the smooth operation of his department that he will lend a hand when necessary, and in doing so he does not step down from his status as a supervisor or as an executive in charge of the department. Moreover, the credible testimony fully establishes that the work that Eddy may have performed, which was of the same nature as that performed by his subordinates, was desultory and irregular and falls far short

644

of the twenty per cent maximum. The only question which is presented in this regard is with reference to Eddy's working on machines during relief and lunch periods when the operators were being relieved. That Eddy did relieve operators at times during these periods is undoubtedly true, but there was a regular relief crew of sufficient number to take over the operation of the machines during these periods and at other times the machines were closed down when there was an insufficient number of relief operators. On the whole factual picture presented by the evidence, I am reasonably satisfied that Eddy did not spend more than the permissible twenty per cent of the hours regularly worked in doing the work of the same nature as that performed by his subordinates.

Substantially the same observations may be made with reference to Oen. The tracer charge operations were similar to the I. B. charge operations, except for the difference in the type of powder used. From fifty to one hundred persons worked under the direct supervision of Oen. He was a University graduate in chemical engineering. He was employed to set up this department and was qualified to do so. His salary was more than $300 per month. That Oen functioned as an executive within the purview of the Regulations is reasonably free from doubt. True, there is a conflict in the evidence, particularly as to the time he spent in relieving operators during lunch and relief periods, but, again, the credible and reasonable evidence fairly sustains the defendant's position that his nonexempt work was within the permissible percentage. My conclusions are, therefore, that the claims of Eddy as supervisor in the I. B. Charge Department, and of Oen as supervisor in the Trace Charge Department must be denied.

There is no dispute as to the amounts due the claimants herein whose claims have been allowed.

Defendant may present proposed findings of fact and conclusions of law in harmony with the views herein expressed upon five days' notice. The question of attorneys' fees will be determined at that time.

An exception is allowed.