**UNITED STATES CARTRIDGE CO. v. POWELL et al.**

**No. 13663.**

United States Court of Appeals
Eighth Circuit.

April 12, 1949.

As Modified on Denial of Rehearing
May 7, 1949.

R. H. McRoberts, Rhodes E. Cave and Marion S. Francis (of Bryan, Cave, McPheeters & McRoberts), all of St. Louis, Mo., for appellant.

Thomas Bond, of St. Louis, Mo., for appellees.

William S. Tyson, Sol., Bessie Margolin, Asst. Sol., and William A. Lowe and E. Gerald Lamboley, Attys., Dept. of Labor, all of Washington, D. C., and Reid Williams, of Kansas City, Mo., amici curiae.

Before GARDNER, Chief Judge, and SANBORN, WOODROUGH, THOMAS, JOHNSEN, RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This is an action brought by a group of fifty-nine plaintiffs who were employed during World War II at the St. Louis Ordnance Plant to recover overtime compensation, liquidated damages, attorney fees, and costs, under the Fair Labor Standards Act of 1938. On trial the court

found all the issues in favor of plaintiffs and entered judgment aggregating $246,251.44 (twice the amount of overtime claimed), plus $24,625.00 as attorney fees and costs. The parties will be referred to as they were designated in the District Court.

Defendant was engaged in the operation of a large munitions plant near St. Louis, Missouri, manufacturing small arms ammunition for use by the military forces of the United States under a cost-plus-a-fixed-fee contract with the United States and under the supervision of the Ordnance Department of the War Department. It is admitted by the pleadings that plaintiffs were all employees of defendant. Plaintiffs allege that defendant was engaged in interstate commerce and in the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act of 1938,[1] and that they were employed in the production of goods for interstate commerce at agreed salaries for a 40-hour week, with the understanding that for all hours which they worked over 40 per week they would be compensated at the rate provided by that Act of one and one-half times the regular rate of pay. Plaintiffs were all employed in defendant's Safety Department.

Defendant denied and still denies that it was engaged in interstate commerce or in the production of goods for interstate commerce, denied that plaintiffs were so employed or at agreed salaries for a 40-hour week or that they were entitled to overtime pay for time worked in excess of 40 hours per week. The defendant alleged and continues to contend that each of the plaintiffs was employed in a bona fide administrative capacity as that term is defined in the Fair Labor Standards Act with the result that that Act did not apply with respect to them. The defendant furthermore set up certain provisions of the Missouri Statute of Limitations as an affirmative defense. After judgment was entered a motion for rehearing was filed, requesting among other things that the cause be reopened to permit defendant to plead and prove the defenses made available to it under the Portal-to-Portal Act, 29 U.S.C.A. § 251 et seq., which had become effective subsequent to the trial and shortly prior to the judgment. This motion was accompanied by an affidavit stating certain facts deemed relevant to those defenses. Plaintiffs answered this affidavit with a counter affidavit. The motion was denied. This appeal followed. We held the case under submission pending the determination of Kennedy v. Silas Mason Co., 1948, 334 U.S. 249, 68 S.Ct. 1031, because of the similarity of certain important issues in both cases. Upon the remand of the Kennedy-Silas Mason case we set aside the submission of this cause and set it for reargument before this court en banc. The parties were granted leave to file supplemental briefs particularly directed to the applicability, if any, of either the Fair Labor Standards Act of 1938, supra; the Act of July 2, 1940, 54 Stat. 712, 50 U.S.C.A. Appendix, §§ 1171, 1172, and 5 U.S.C.A. § 189a; or the Walsh-Healey Public Contracts Act of June 30, 1936, 49 Stat. 2036, 41 U.S.C.A. § 35 et seq. Pursuant thereto the cause was re-argued and supplemental briefs bearing upon the applicability of the above-mentioned Acts were filed.

Defendant contends (1) that plaintiffs were not engaged in the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act, and were not included within the coverage of that Act, (2) that it was not engaged in interstate commerce or in the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act, (3) that the ammunition produced by defendant for the United States was for use in the war and was not "goods" within the meaning of that Act, (4) that plaintiffs were not engaged in interstate commerce or in the production of goods for commerce, (5) that the burden was on plaintiffs to plead and prove the coverage of the Act, the hours worked, and that they were engaged in the production of "goods" as defined in the Fair Labor Standards Act, which burden was not sustained, (6) that plaintiffs were employed in a bona fide administrative capacity and

---

[1] 29 U.S.C.A. § 201 et seq.

were exempt from the provisions of the Fair Labor Standards Act, (7) that the judgment of the trial court is in any event excessive in that it (a) is based on the erroneous assumption that the salaries paid plaintiffs were base pay for a 40-hour week instead of a variable or 48-hour week, (b) includes in the computations of hours worked a one-half hour lunch period, and (c) includes as hours worked, time prior to the beginning of and following the ending of plaintiffs' regular work shifts, (8) that the claims of certain plaintiffs were barred by Sections 1012 and 1015, R.S.Mo. 1939, Mo.R.S.A., (9) that the provisions of the Portal-to-Portal Act of 1947 are binding in this case and defendant should have been given the opportunity to plead and sustain the defenses made available to it under the Act, and (10) that two of the plaintiffs died while the cause was under submission and there has been no proper substitution and revival.

The trial court found that defendant was engaged in interstate commerce and in the production of goods for commerce within the meaning of the Fair Labor Standards Act and gave judgment for plaintiffs under that Act, including, as heretofore noted, the overtime claimed, liquidated damages, and attorney fees.

There is no serious dispute concerning the underlying facts. Defendant entered into a cost-plus-a-fixed-fee contract with the United States Government to operate and maintain the munitions plant in suit and to produce therein and thereat small arms and ammunition in huge quantities for the United States Government. The Government acquired the site for the plant, erected all of the buildings and installed all of the machinery, to all of which it retained title. The Government furnished defendant with all raw materials or the funds with which to acquire them. The title to all raw materials and finished munitions remained in the Government. A large part of those materials were shipped to the plant from outstate, some by the Government and some on defendant's orders consigned to defendant. All those materials were unloaded at the plant by defendant's employees. Defendant manufactured those raw materials into arms and ammunition at the plant in Missouri. In doing so it had the actual physical possession of the material and products thereof, but all operations were under the direct supervision of representatives of the United States Government. All completed products were carefully inspected by the Government. And all of those products were shipped upon the order of the Government to places specified by it. Predominately, if not entirely, those destinations were beyond the confines of the State of Missouri. Those shipments were usually on Government bills of lading, but occasionally they were made on defendant's bills of lading. All of the finished products with one exception were shipped at Government expense to points for use by it in the war. That exception consisted of small quantities of test ammunition sent to Purdue University and a point in Pennsylvania for test purposes. A by-product, scrap copper or brass, resulting from the making of shells, appears to have been transported in defendant's trucks to a nearby cartridge company on defendant's commercial bill of lading. This appears to be the only product resulting from defendant's manufacturing process which left the plant on other than Government bills of lading. The title to this by-product appears to have remained in the Government. All shipments from the plant were crated and loaded by defendant. Bills of lading and shipping papers were prepared by defendant's employees. The defendant by the terms of the contract was required to do all things necessary to the operation of the plant, to hire all employees, to inspect and check all materials by its own inspectors before submitting the goods to the Government for acceptance, to keep records and books of account showing the cost of all labor, material and other expenditures, to pay employee contributions under the Federal Social Security Act, 42 U.S.C.A. § 301 et seq., and to pay all state and local taxes, licenses or fees required by state law, including state compensation laws. Extensive railroad switching facilities were constructed on the plant site (which was a military reservation). These facilities were also owned by the Government, as well as the switch engines and

similar equipment. This equipment was stated by defendant to have been manned and operated by defendant's employees. The defendant was designated in the contract as an independent contractor [2] but the Government had, as heretofore noted, the right to make any changes its representatives deemed necessary in the method of performing the work and, as heretofore inferred, it paid all operating costs. Defendant's fixed fee was based upon the amount of the completed product produced. As many as 40,000 employees were at times engaged at the plant. All were engaged in the production of munitions for the Government under defendant's contract with the Government. More than six billion small arms cartridges were produced. The contract specifically provided that the provisions of the Walsh-Healey Act should apply to this contract.[3] These plaintiffs, as well as all other employees of defendant,

[2] From the contract, page 780 of the Record: "It is expressly understood and agreed by the Contractor and the Government that in the performance of the work provided for in this contract, the Contractor is an independent contractor and in no wise an agent of the Government."

[3] From the contract, page 783 of the Record:

"Article III-D—Walsh-Healey Act.

"1. The following representations and stipulations pursuant to the Walsh-Healey Public Contracts Act (Act of June 30, 1936: 49 Stat. 2036; 41 U.S.C. 35-45 [41 U.S.C.A. §§ 35-45]), shall apply to the performance of this contract:

"(a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

"(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract: Provided, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

"(c) No person employed by the Contractor in the manufacture of furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of 8 hours in any 1 day or in excess of 40 hours in any 1 week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

"(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

"(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are insanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part hereof is to be performed shall be prima facie evidence of compliance with this subsection.

"(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of $10 per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of the con-

174 F.2d—46

were notified in a booklet given them at the commencement of their employment that over-time would be compensated for at the rate provided under the Walsh-Healey Act and the Fair Labor Standards Act.[4] The relationship between the Government and defendant in the operation of the plant was also described in this booklet.[4] As noted

tract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or under-payments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered: Provided, that no claims by employees for such payments shall be entertained unless made within 1 year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

"(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the act available for inspection by authorized representatives of the Secretary of Labor.

"(h) The foregoing stipulations shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

"2. Stipulation (b) of section 1 of this Article III-D with respect to wages is operative due to determination by the Secretary of Labor of prevailing minimum wage rates for the industry involved."

[4] From the booklet given employees, page 191 of the Record:

"The Saint Louis Ordnance Plant is wholly owned by the United States Government. The United States Cartridge Company is the operating agent."

From the booklet given employees, pages 203-204 of the Record:

"Wages of Employees.

"It is the policy of the Saint Louis Ordnance Plant to pay each employee a wage in keeping with the rates determined by the Ordnance Department of the United States Army for ammunition production. Since our product is for our United States Government, and since each employee is a part of our government, it is naturally expected that each employee will strive diligently to turn out an honest day's work for a fair wage.

"The company pays you your wages but it is immediately repaid by the United States Government.

"In the final analysis, your wages come from the United States Government, whose only source of income is taxes collected from you and all other citizens.

"The United States Cartridge Company is merely managing the plant for the Federal Government.

"An employee's remuneration consists not only of the money he receives each payday, but also the Company's contribution to the Social Security, Workmen's Compensation for accident protection, and Unemployment Compensation funds."

From the booklet given employees, page 206 of the Record:

"Standard Hours of Work.

"There will be eight hours in any working day, and forty hours will constitute a working week. To meet the schedule required of us by the National Defense Program, it will be necessary to employ three shifts on production operations. When production demands require a longer work day, or longer work week, the Company will pay the legal overtime rate as provided under the Walsh-Healey Act, and the Fair Labor Standards Act. When three shifts are operating there will be rotation of the first, second and third shifts every two weeks. A lunch period will be allowed on each shift and will be paid for by the Company, that is, no deduction will be made for this lunch period.

"Payment of Overtime.

"Time and one-half will be paid in excess of eight hours per day or forty hours per week. Time and one-half also is paid for authorized work on Sunday and national holidays, except in departments or occupations where the established schedule requires seven days continuous operations. This means that overtime is paid for Sunday work and holidays on repair, maintenance, mechanical and new routine process operations, but not for work such as watching, plant protection, or continuous procedure operations. The following national holidays—New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas, will be observed.

"It will be the policy of the Company to avoid work on Sundays and Holidays as far as possible. However, since we are a part of the National Defense program, we shall have to adjust our schedule according to the needs of the situation."

heretofore, defendant's answer admitted that plaintiffs were its employees. There was no issue presented concerning the propriety of the rate of pay under any Federal or State law. The controversy relates to whether the Fair Labor Standards Act applies, whether plaintiffs are within the class of employees entitled to overtime under the Act, and, if so, the extent of that overtime, whether liquidated damages and attorney fees are recoverable, and whether defendant should have been permitted to amend its answer setting up defenses under the Portal-to-Portal Act.

There are many cases bearing upon the problem with which we are confronted.[5] No good purpose will be served by an analysis of each of them here, since it is obvious from the opinion of the Supreme Court in Kennedy v. Silas Mason Company, supra, that that court will in due time authoritatively determine the correctness of the various conclusions expressed in those cases.

As to the application of the Walsh-Healey Act. It is clear and undisputed that all of the articles manufactured by defendant were manufactured pursuant to a con-

[5] Holland v. Haile Gold Mines, D. C., 44 F.Supp. 641; Walling v. Haile Gold Mines, Inc., 4 Cir., 136 F.2d 102; Fox v. Summit King Mines, 9 Cir., 143 F.2d 926; St. Johns River Shipbuilding Company v. Adams, 5 Cir., 164 F.2d 1012; Crabb v. Welden Brothers, 8 Cir., 164 F.2d 797; Clyde v. Broderick, D.C., 52 F.Supp. 533; Clyde v. Broderick, 10 Cir., 144 F.2d 348; Anderson v. Federal Cartridge Corp., D.C.Minn., 72 F.Supp. 639; Barksdale v. Ford, Bacon & Davis, Inc., D.C.E.D.Ark., 70 F.Supp. 690; Clyde v. Broderick, D.C.Colo., 52 F.Supp. 533, reversed on other grounds, 10 Cir., 144 F.2d 348; H. B. Deal & Company, Inc., v. Leonard, 210 Ark. 512, 196 S.W.2d 991; Dickenson v. Trojan Powder Co.,* D.C.N.D. Ohio, W.D., Divins v. Hazeltine Electronics Corp., D.C.S.D.N.Y., 70 F.Supp. 686, affirmed 2 Cir., 163 F.2d 100; Hays v. Hercules Powder Co., D.C.W.D.Mo., 7 F.R.D. 747; Kennedy v. Silas Mason Company, D.C., 68 F.Supp. 576, affirmed D.C.W.D.La., 70 F.Supp. 929, affirmed 5 Cir., 164 F.2d 1016; Kruger v. Los Angeles Shipbuilding and Drydock Corp., D.C.S.D.Calif., 74 F.Supp. 593; Lynch v. Embry-Riddle Co., D.C.S.D.Fla., 63 F.Supp. 992; Matlock v. Sanderson & Porter, Cir.Ct.Ark., 7 Labor Cases, Par. 61,-806; Patton v. Roane-Anderson Co., D.C. E.D.Tenn., 84 F.Supp. 72; Raymond v. Parrish, 71 Ga.App. 293, 30 S.E.2d 669; Ritch v. Puget Sound Bridge & Dredging Co., D.C.W.D.Wash., 60 F.Supp. 670, reversed on other grounds, 9 Cir., 156 F.2d 334; Selby v. J. A. Jones Construction Co., D.C.E.D.Tenn., 84 F.Supp. 74; Stewart v. Kaiser Company, Inc., D.C.Or., 71 F.Supp. 551; Torres v. Lock Joint Pipe Co., Prentice-Hall Wage & Hour Service, D.C.Puerto Rico, 84 F.Supp. 5; Trefs v. Foley Bros., Inc., 7 Labor Cases, D.C.W.D.Mo., 84 F.Supp. 159; Young v. Kellex Corporation, D.C.E.D.Tenn., 82 F.Supp. 953; Cody et al. v. Dossin's Food Products, 6 Cir., 156 F.2d 678; Jones v. Springfield Missouri Packing Co., D. C., 45 F.Supp. 997; Gibson v. St. Paul Fire & Marine Insurance Co., 117 W.Va. 156, 184 S.E. 562; Tripp v. United States Fire Ins. Co., 141 Kan. 897, 44 P. 2d 236; Bell v. Porter, 7 Cir., 159 F.2d 117; Jackson v. Northwest Airlines, D.C. Minn.1947, 75 F.Supp. 32; O'Riordan v. Helmers, Inc., N.Y.C.Ct.1947, 73 N.Y.S. 2d 428; Ware v. Goodyear Corp.,* D.C. S.D.Ind.1946, Swettman v. Remington Rand, D.C.S.D.Ill.1946, 65 F.Supp. 940; Moehl v. Dupont de Nemours & Co., D.C. N.D.Ill.1947, 84 F.Supp. 427; Blazier v. Western Pipe & Steel Co., D.C.S.D.Cal. 1946, 84 F.Supp. 38; Tiller v. Anchor Optical Corp., D.C.S.D.N.Y.1947, 83 F.Supp. 1010; Roland v. United Airlines, D.C.N. D.Ill.1947, 75 F.Supp. 25; Belanger v. Hopeman Bros., D.C.D.Me.1947, 6 F.R. D. 459; Umthun v. Day & Zimmerman, Inc., 1944, 235 Iowa 293, 16 N.W.2d 258; Timberlake v. Day & Zimmerman, D.C. S.D.Iowa, 1943, 49 F.Supp. 28; Lasater v. Hercules Powder Co., D.C.E.D.Tenn. 1947, 73 F.Supp. 264; McCumsky v. Norden, Inc., N.Y.S.Ct. 1947, 88 N.Y.S. 2d 547; Simkins v. Elmhurst Construction Co., 181 Misc. 791, 46 N.Y.S.2d 26, affirmed 181 Misc. 793, 50 N.Y.S.2d 408, affirmed 268 App.Div. 858, 51 N.Y.S.2d 82; Steiner v. Pleasantville Constructors, 181 Misc. 793, 46 N.Y.S.2d 120, affirmed (modified on other grounds) 182 Misc. 66, 49 N.Y.S.2d 42, affirmed 269 App. Div. 798, 54 N.Y.S.2d 700; Henderson v. Bechtel-McCome Corp., D.C.N.D.Ala., 1947, 84 F.Supp. 30; Fox v. Summit King Mines, 9th Cir., 143 F.2d 926; Bailey v. Porter, D.C.N.D.Ill.1947, 83 F. Supp. 988; Southern California Freight Lines v. Davis, 9 Cir., 167 F.2d 708; Harrington v. Empire Construction Co., 4 Cir., 167 F.2d 389; Kovacs et al. v. Metropolitan Life Insurance Company et al., D.C.S.D.N.Y.1948, 9 F.R.D. 102.

* No opinion for publication.

tract between defendant and an agency of the United States for the manufacture of "materials, supplies, articles, and equipment in [an] amount exceeding $10,000.00", and that plaintiffs and all other employees of defendant were at all times engaged exclusively "in the manufacture * * * of materials, supplies, articles, or equipment used in the performance of the contract"[6] between defendant and the United States.

Which of these two acts did Congress intend should apply to a cost-plus-a-fixed-fee contractor manufacturing munitions of war exclusively for the United States under contract with the United States? If a portion of defendant's business had been devoted to the "production of goods for commerce" for others than the United States, the question whether the Walsh-Healey Act should apply to the employees engaged in the production of the munitions under contract with the United States and the Fair Labor Standards Act should apply to other employees would be a proper subject for consideration. But such is not the case here. All goods produced were for the United States under contract therewith. It has not been suggested and could not be reasonably contended that the Walsh-Healey Act was repealed by the passage of the Fair Labor Standards Act, in view of the amendment of the former subsequent to the passage of the latter, the recognition of the Walsh-Healey Act in the National Defense Act of July 2, 1940, Title 50 U.S.C.A.Appendix, §§ 1171, 1172,[7] and Executive Order 9001 of The President, 50 U.S.C.A.Appendix, § 611 note, issued December 27, 1941, 6 Fed.Register 6787.[8]

The Walsh-Healey Act is not an exercise by Congress of regulatory power over private industry or employment, nor an act of general application to industry. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 113, 84 L.Ed. 1108; Endicott-Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424. The purpose of the Act was, as pointed out in Endicott-Johnson Corp. v. Perkins, to raise labor standards for the segment of industry doing business with the Government. To accomplish that purpose, it specified, as the terms on which the Government would do business with private concerns, the hours of employment and that overtime should be paid for all hours in excess of 40 hours per week. It applied irrespective of whether the workers employed in producing the goods contracted for were engaged in producing goods "for commerce" or exclusively in intra-state commerce. The sole criterion of application in that regard was that the goods were to be produced for the Government. And with respect to hours of work and rates of pay, the Walsh-Healey Act was more favorable to labor than the later Fair Labor Standards Act, in that there was no progressive reduction of weekly hours of labor from 44 hours to 40, as in the Fair Labor Standards Act, and there was no minimum wage fixed at a figure comparatively low if compared with wages actually being paid in manufacturing industries. The Walsh-Healey Act fixed the wage to be paid at not less than the minimum wage (to be determined by the Secretary of Labor) for persons employed on similar work in the locality where the goods for the Government were to be produced. The Fair Labor Standards Act had

---

[6] Walsh-Healy Act, Title 41 U.S.C.A. § 35.

[7] That Act provides: "That no contract entered into pursuant to the provisions of this section which would otherwise be subject to the provisions of the Act entitled 'An Act to provide conditions for the purchase of supplies and the making of contracts by the United States, and for other purposes', approved June 30, 1936 (49 Stat. 2036; 41 U.S.C., secs. 35-45), shall be exempt from the provisions of such Act [sections 35-45 of Title 41] solely because of being entered into without advertising pursuant to the provisions of this section."

[8] That Order provides: "No contract or modification or amendment thereof shall be exempt from the provisions of the Walsh-Healey Act (49 Stat. 2036) [41 U.S.C.A. sections 35-45] because of being entered into without advertising or competitive bidding, and the provisions of such act, the Davis-Bacon Act, as amended (49 Stat. 1011), [40 U.S.C.A. sections 276a to 276a-5] the Copeland Act, as amended (48 Stat. 948) [40 U.S. C.A. sections 276b and 276c], and the Eight Hour Law, as amended by the Act of September 9, 1940 (Public No. 781, 76th Congress) [40 U.S.C.A. sections 321 et seq.] if otherwise applicable shall apply to contracts made and performed under the authority of this Order."

also as its purpose the improvement of living conditions and labor standards. It was designed and intended to affect private industry engaged in interstate commerce. Its provisions relative to minimum wages and hours of labor for those employed in making goods for the United States were unnecessary as provision therefor equal or more advantageous to labor had already been made by the Walsh-Healey Act. The Fair Labor Standards Act further provided that the employee might recover liquidated damages and attorney fees. But the Walsh-Healey Act had already provided sanctions for the violation by those furnishing goods to the United States of its provisions relative to hours of employment and rates of pay, and had already provided that any wages due employes engaged in producing goods for the United States might be withheld by the United States and paid to the employee or recovered in the name of the United States by the Attorney General and paid to the employee. Thus, the Walsh-Healey Act had provided for the collection of any wages due employees such as plaintiffs without cost to them and had provided sanctions more severe in some respects than those of the Fair Labor Standards Act for failure to pay without compulsion.

The Wage and Hour Division of the Department of Labor, as Amicus Curiae, suggests that both Acts may be applicable and that plaintiffs may have the benefit of the most favorable provision of either—in this instance, the liquidated damages and attorney fee provisions of the Fair Labor Standards Act. We are not impressed with the view that Congress intended that an employee might elect which of these Acts would apply to his individual employment or claim for compensation, with the attending confusion in computing wages and the collection of claims therefor. Nor are we impressed with the view that Congress intended that when an industry was engaged in producing munitions of war for the United States under a cost-plus-a-fixed-fee contract and failed to pay an employee engaged in such production his proper wages, that the United States should be required to pay him not only his unpaid wages but also an amount equal thereto as liquidated damages, and, in addition, his attorney fees, when another method of safe-guarding the employees' rights had been provided which does not entail such a penalty against the United States. We are of the opinion that the two Acts are sufficiently divergent that both may not apply at one and the same time, that the Walsh-Healey Act was intended by Congress to apply to the employees of manufacturers engaged in producing munitions of war for the United States, and that under the Walsh-Healey Act liquidated damages and attorney fees may not be recovered by the employee.

It has been suggested that the National Defense Act of July 2, 1940, suspended the operation of the Fair Labor Standards Act and, a fortiori, the Walsh-Healey Act. The National Defense Act was passed in the interest of national defense, to provide for the production of war materials of all kinds necessary to the successful prosecution of the war. Summarized, it authorizes the Secretary of War to provide for the construction of plants and facilities for the development, manufacture, maintenance, and storage of military equipment, munitions and supplies, and to provide for the purchase, manufacture, shipment, and storage of such supplies. It carries a provision that the regular working hours of laborers and mechanics employed by the Department of the Army, who are engaged in the manufacture, or production, of military equipment, munitions, or supplies, shall be eight hours per day or forty hours per week during the period of the national emergency and that overtime shall be compensated for at one and one-half times the regular rate of pay. But it contains a proviso, as heretofore noted, that no contract which would otherwise be subject to the provisions of the Walsh-Healey Act should be exempt therefrom merely because contracts entered into pursuant to the authority of the National Defense Act were made without advertisement. We have indicated above that we construe this latter proviso as a recognition by Congress of the continued effectiveness of the Walsh-Healey Act.

Our attention has been directed to our opinion in Day & Zimmerman v. Reid, 168 F.2d 356, as authority for plaintiffs' right

to recover liquidated damages and attorney fees under the Fair Labor Standards Act. The defense interposed to plaintiffs' claim in that case was the Portal-to-Portal Act of 1947. The parties stipulated the amount due plaintiffs under the Fair Labor Standards Act, subject to a determination by the court of plaintiffs' right to recover that amount in view of the defense interposed under Section 9[9] and 11[10] of the Portal-to-Portal Act. The trial court construed and applied the Portal-to-Portal Act. Our review was limited to the correctness of the trial court's action in that regard. No question was raised concerning the application of the Fair Labor Standards Act, the Walsh-Healey Act, or the National Defense Act, and no such question was decided. That case is therefore no authority in the present case.

Since the district court did not have jurisdiction of the cause under the Fair Labor Standards Act and since the Walsh-Healey Act does apply and plaintiffs may not maintain this action under the Walsh-Healey Act, the cause is reversed.

JOHNSEN, Circuit Judge (concurring separately).

On September 8, 1939, the President proclaimed the existence of a national emergency with respect to "the strengthening of our national defense within the limits of peace-time authorizations." Proclamation 2352, 3 CFR, 1939 Supp., pp. 59, 60.

The Congress took cognizance of the emergency and sought to "expedite" the strengthening of our national defense, by grants of additional powers to the President, the Secretary of War, the Secretary of the Navy, and the Secretary of the Treasury, "during the national emergency declared by the President * * * to exist," for the purpose of facilitating the obtaining of necessary implements, munitions, etc., for the military, naval, and coast guard services.

Two measures, popularly known as the National Defense Acts, were enacted in June and July, 1940. The first of these, Act of June 28, 1940, 54 Stat. 676, Ch. 440, 50 U.S.C.A.Appendix § 1151 et seq., had relation primarily to the naval and the coast-guard services, but it contained the following general provision: "During the national emergency declared by the President on September 8, 1939, to exist, the provisions of the law prohibiting more than eight hours' labor in any one day of persons engaged upon work covered by Army, Navy, and Coast Guard contracts shall be suspended." 54 Stat. 678, 679, § 5(b), 50 U.S.C.A.Appendix, § 1155(b). The second of the National Defense Acts, Act of July 2, 1940, 54 Stat. 712, ch. 508, 50 U.S.C.A. Appendix, § 1171 et seq., 5 U.S.C.A. § 189a, had application to the War Department.

Under subsection (a) of § 1 of this Act, the Secretary of War was given power, without the necessity of resorting to advertising, to provide, among other things, for the purchase or manufacture of military equipment, munitions, and supplies, and for shelter, "under such conditions as he may deem necessary". He was similarly empowered to purchase or to construct munitions plants, as well as to provide "Government–owned facilities at privately owned plants". Subsection (b) expressly authorized him to operate any such plants acquired or constructed and any facilities so furnished, "either by means of Government personnel or through the agency of selected qualified commercial manufacturers under contracts entered into with them". There was a further general provision in section 1, authorizing him to make such contracts or such amendments or supplements to existing contracts, "as he may deem necessary to carry out the purposes specified in this section."

These were extraordinary powers, intended to be granted for a limited period only, and designed to accomplish an emergency purpose. The scheme, which is involved in the present situation, of producing munitions in government–owned plants, "through the agency of selected qualified commercial manufacturers," on the basis of cost plus a fixed fee for carrying on the operations, with title to both the materials used in the products manufactured resting at all times in the United States, was admittedly a novel and revolutionary set-up in the field of American industrial life. The "Statement of Labor Policy," is-

---

[9] 29 U.S.C.A. § 258.

[10] 29 U.S.C.A. § 260.

sued jointly by the War and Navy Departments on June 22, 1942, with the approval of the President of the American Federation of Labor and the Chairman of the Congress of Industrial Organizations, characterized it in this language: "The industrial units thus created are unique. * * * These plants embody a new and tripartite relationship among Government, labor, and management."

The commercial operating agency was not economically affected by the production costs and so had no direct concern about the wages and overtime rates that might be paid in the plant. These questions therefore were matters which the Government of necessity was required to resolve. If it could be said to have been the intention of Congress to make the Walsh-Healey Public Contracts Act, 49 Stat. 2036, 41 U.S.C.A. § 35 et seq., govern the hybrid relationship involved, the scale of minimum wages and the rate of overtime pay were matters over which the Secretary of Labor had generally the power of determination and control.

I can see some sound reasons to doubt that the National Defense Acts could have intended to permit of any possibility of a slowing of the Secretary of War's and the Secretary of the Navy's emergency defense efforts through a necessary resort to the normal processes of investigation, determination, etc., by the Secretary of Labor, as the latter would have the power to compel them to do under the Walsh-Healey Act. Moreover, Congress did not expressly declare that the unique hybrid relationship, which it was permitting to be created as an emergency measure, was within the operation of the Walsh-Healey Act. In fact, it specifically refused to make a general declaration that all contracts made by the Secretary of War under section 1 of the Act of July 2, 1940, should be subject to the provisions of the Walsh-Healey Act. The Conference Committee Report on the Bill had contained the following statement (Cong.Rec., Vol. 86, Part 8, p. 8901): "The conference agreement * * * provides that instead of all contracts under the section being subject to the provisions of the Walsh-Healey Act, no such contract which would otherwise be subject to such Act should be exempt from its provisions solely because it was entered into without advertising." And pursuant to the conference agreement, section 1 of the Act, on final passage, was made to contain the simple proviso, "That no contract entered into pursuant to the provisions of this section which would otherwise be subject to the provisions of the (Walsh-Healey) Act * * * shall be exempt from the provisions of such Act solely because of being entered into without advertising pursuant to the provisions of this section."

Parenthetically, it may be observed that there, of course, would be contracts made by the Secretary of War, in fields apart from that of the operation of the government-owned munitions plants, which normally and regularly would be subject to the provisions of the Walsh-Healey Act, except as it might be sought to be contended that they had been taken out of the operation of that Act because they had been made without advertising. The proviso quoted above would preclude the making of any such argument.

Beyond the failure expressly to provide that the hybrid relationship involved in the operation of a government-owned munitions plant should be governed by the Walsh-Healey Act, the Act of July 2, 1940, as I have already pointed out, further used such terms in relation to the scope of the Secretary of War's contracting powers as, "under such conditions as he may deem necessary" and "as he may deem necessary to carry out the purposes specified in this section". If a test of these powers should have arisen in a situation indicating the impossibility or impracticality, in attempting to make prompt defense preparations, of having the wage scales and overtime rates fixed in these plants except by War Department action, I should doubt that any court would have difficulty in seeing in the nature and the language of the Act, as I have discussed them above, a reservoir of power in the Secretary of War so to act, independent of the wage and hour provisions of any other statute.

The Secretary of War's actions, under this concept of the statute, might perhaps be subject to the control of an Executive Order issued by the President, and, of course, they necessarily would be so after

the War itself began in 1941. The only other limitation that probably would exist on the Secretary's power was the clear indication of a congressional policy to have overtime rates paid for work in excess of 40 hours per week, as reflected in the express command in section 4(b) of the Act, 5 U.S.C.A. § 189a, applicable to any direct operation of defense plants by the Secretary of War himself, that "the regular working hours of laborers and mechanics employed by the War Department, who are engaged in the manufacture or production of military equipment, munitions, or supplies shall be eight hours per day or forty hours per week during the period of any national emergency declared by the President to exist: Provided, That under such regulations as the Secretary of War may prescribe, such hours may be exceeded, but compensation for employment in excess of forty hours in any workweek, computed at a rate not less than one and one-half times the regular rate, shall be paid to such laborers and mechanics."

But I do not think it necessary to discuss this aspect of the question further in the present case. Whether the Secretary of War had power generally under the Act of July 2, 1940, to fix wage scales and overtime rates and rights for the employees in the hybrid relationship involved in these munitions plants, as I have referred to above, without regard to the provisions of the Walsh-Healey Act, I agree that the provisions of the Walsh-Healey Act are in any event controlling of the employees' rights here. If the Secretary of War had such plenary powers under the Act of July 2, 1940, as I have discussed, the provisions of the Walsh-Healey Act are nevertheless controlling in the present situation, because the War Department, in its contract with the operator of the plant, specifically made the provisions of that Act applicable to the wage and overtime rights of the employees, as the Secretary of War would have the right to do under the circumstances.

If the Act of July 2, 1940, did not give the Secretary of War such plenary powers in the defense situation as I have discussed, the Walsh-Healey Act, and not the Fair Labor Standards Act, still clearly is controlling here, as a matter of general application in the field involved. In the enactment of the Walsh-Healey Act, Congress, I think, intended to constitute such employees as would be engaged in producing supplies or goods directly for the Government under an express contract, as a special legislative class, and, through the force of the Government's contracting power, to control their hours of labor, their rate of minimum pay, and their overtime rights, to the extent that it deemed it necessary in this field. It did not relate its jurisdiction in the field to any test of commerce, and the question of commerce therefore, in my opinion, has nothing to do with the rights of the class.

The Walsh-Healey Act establishes a special and complete labor policy of its own. It is intended to prevent any working of a covered employee for more than eight hours a day or forty hours a week, except with the permission of the Secretary of Labor. 41 U.S.C.A. § 35. Unless the Secretary of Labor permits overtime work to be done, the employer may not allow his employees to engage in any. If the Secretary permits overtime work, he has the right to fix the rate that shall be paid therefor, "which rate shall be not less than one and one-half times the basic hourly rate received by any employee affected". Id., § 40. Minimum wages must be paid the employees of "not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract". Id. § 35. Where the contracting party otherwise has been engaged generally in commerce or in the production of goods for commerce, his wage scale presumably will have met the standards prescribed by the Fair Labor Standards Act, but manifestly the minimum wages determined by the Secretary of Labor to be applicable in the performance of some Government contract may exceed the Fair Labor Standards Act's requirements.

The Walsh-Healey Act further specifically recognizes that special elements of public interest may exist in the performance of

such a Government contract, which command consideration, and it accordingly empowers the Secretary of Labor to make exceptions or dispensations with respect to the provisions of the Act in necessary situations, "in the public interest or to prevent injustice and undue hardship" or where otherwise it might "seriously impair the conduct of Government business". Id. § 40.

All of these provisions set up standards and requirements, which are without any relationship to the Fair Labor Standards Act. And an employee to whom the Walsh-Healey Act has application cannot claim the right to come generally under the Fair Labor Standards Act, for that would nullify the power of the Secretary of Labor to exercise his judgment with respect to some of the elements which Congress recognized that he might find it necessary to give consideration to, in the practical performance of, or in meeting a public need under, a Government contract.

The employees here predicate and seek to recover overtime rights on the basis of the Fair Labor Standards Act. But whatever rights they may have had in the situation, as I have pointed out, are derived from the Walsh-Healey Act, under the contract incorporating its provisions, and not from the Fair Labor Standards Act. The incongruity of their attempt to invoke the Fair Labor Standards Act is readily apparent, I think, when the fact is taken into account that, under the Walsh-Healey Act, there could be no overtime work unless the Secretary of Labor gave his permission thereto, and that, except during the existence of Executive Order No. 9240, dated September 9, 1942, 40 U.S.C.A. § 326 note, 7 F.R. 7159, as amended by Executive Order No. 9248, dated September 17, 1942, 7 F.R. 7419, which, as a war measure, limited all overtime payments in industries related to the prosecution of the war to not more than one and one-half times the regular wage rates, the Secretary of Labor, as a condition of granting such permission, could require the payment of overtime rates in excess of this amount, if he saw fit. The situation under the Walsh-Healey Act therefore was not one that was subject to the automatic overtime rate of the Fair Labor Standards Act. And whether over-

time rights stemming from the Walsh-Healey Act might have been fixed in some situation at one and one-half times, or double, or treble, the regular wage scale, there would be no more right in the one case than in the others to use the Fair Labor Standards Act as a vehicle for their collection.

It must be remembered that Congress provided the Walsh-Healey Act with its own system of sanctions and procedure for accomplishing the objectives and vindicating the rights which it was intended to establish. That the Walsh-Healey Act does not permit of a direct suit by an employee on the contract between the Government and the employer may be an argument sentimentally in favor to why the Fair Labor Standards Act ought to apply, but it is hardly sound rationale legally for holding that it does. Nor does the fact that the munitions produced may have been shipped in interstate commerce weigh in favor of the application of the Fair Labor Standards Act, as against the inexorable fact that the Walsh-Healey Act stands as a special statute, for a specific class, involving indicated factors of consideration in public interest and governmental functioning, not made applicable to the general field of the Fair Labor Standards Act, and to which the commerce test therefore has no relation.

It might further be observed that, if Congress had intended the employees of the approximately 100 government-owned munitions plants, that were established, to have rights beyond those granted by the National Defense Acts or the Walsh-Healey Act, and to be able generally to recover double damages and attorneys' fees, it hardly seems reasonable to suppose that it would have left the situation so that those working in some plant, which might by chance be making guns, ammunition, or other supplies entirely for use at some training camp or on some rifle or artillery range, existing within the same state where the plant was located, would be precluded from such benefits on the basis of a commerce test, when it had the power, and there would seem to be no reason not, to have treated them equally with the employees of other such munitions plants. It

might also be added that, if the Secretary of War had no such plenary powers under the Act of July 2, 1940, to fix wage rates and overtime rights, as I have initially suggested, but he was required to act in relation to such other statutes as existed and to guide his actions by whichever was applicable, the provision which he made in the contract, subjecting it to the obligations under the Walsh-Healey Act and not the Fair Labor Standards Act, could properly be viewed as an administrative interpretation and accorded the weight to which it normally would be entitled, in the emergency situation in which it was necessary for him to resolve the question and to act.

I can see no basis for any right in the situation to maintain an action under the Fair Labor Standards Act, and I agree that the suit should be dismissed.

SANBORN, WOODROUGH and RIDDICK, Circuit Judges, besides joining in the Court's official opinion, concur also in the foregoing separate opinion.