# POWELL ET AL. *v.* UNITED STATES CARTRIDGE CO.

NO. 96.

Argued December 8–9, 1949.—Decided May 8, 1950.

*Thomas Bond* argued the cause and filed a brief for petitioners in No. 96.

By special leave of Court, *Bessie Margolin* argued the cause for the United States, as *amicus curiae,* urging reversal. With her on the brief were *Solicitor General Perlman, Robert L. Stern, William S. Tyson* and *E. Gerald Lamboley.*

*June P. Wooten* argued the cause for petitioners in No. 79. With him on the brief were *Charles H. Earl, Paul Talley, Wayne W. Owen, Cooper Jacoway* and *Gerland P. Patten.*

*Wayne Owen, C. M. Kennedy* and *Pat Coon* submitted on brief for petitioners in No. 58.

*William L. Marbury* argued the cause for respondents.

*Robert H. McRoberts* argued the cause for respondent in No. 96. *Mr. Marbury* was with him on the brief.

*E. L. McHaney, Jr.* argued the cause for respondent in No. 79. With him on the brief were *Mr. Marbury, Otto Atchley* and *Mr. McRoberts.*

*Otto Atchley* argued the cause for respondent in No. 58. *Mr. Marbury* was with him on the brief.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question in each of these cases is whether the Fair Labor Standards Act of 1938, as amended,[1] applies to a person employed by a private contractor at a Government-owned munitions plant operated by the contractor under a cost-plus-a-fixed-fee contract made with the United

[1] 52 Stat. 1060, *et seq.,* 53 Stat. 1266, 54 Stat. 615–616, 55 Stat. 756, 61 Stat. 87, 63 Stat. 446, 910–920, 29 U. S. C. §§ 201–219, 29 U. S. C. (Supp. III) §§ 201–217.

States. We hold that the Act does apply but we do not reach the question of the validity of the individual claims based upon it.

This issue was argued here in *Kennedy* v. *Silas Mason Co.*, 334 U. S. 249. We, however, remanded that case and withheld decision of the issue, awaiting a more solid basis of findings. *Id.* at p. 257. Each of the instant cases presents such a basis.

### No. 96 (The Powell Case).

In December, 1940, the United States contracted with The United States Cartridge Company, respondent herein, as "an independent contractor and in no wise an agent of the Government" on a cost-plus-a-fixed-fee basis to operate the Government's St. Louis Ordnance Plant in Missouri.[2] The contract stated that it was authorized by the Act of July 2, 1940.[3] It provided that the respondent would operate the Government's plant for the manufacture of certain types and quantities of small arms ammunition, that the Government would reimburse the

---

[2] Congress charged the War and Navy Departments with the operation of about 100 giant Government-owned munitions plants. Those Departments had the option of operating them themselves or through commercial contractors. So as to utilize fully the labor and management resources of the nation and to minimize encroachment upon its industrial structure, both Departments chose the latter course. As to the general war production policies, see *Lichter* v. *United States*, 334 U. S. 742, 767–768. Out of 143 billion dollars of contracts made by the War Department between 1941 and 1946, over 40 billions were cost-plus contracts. Out of 68 billion dollars of Navy contracts, 18 billions were cost-plus contracts. Hearings before Subcommittee of the Senate Committee on the Judiciary on S. No. 70, 80th Cong., 1st Sess. 422–423, 624–626 (1947). The quotation in the text is from the contract in this case, see p. 505, *infra*.

[3] 54 Stat. 712–714, 50 U. S. C. App. §§ 1171, 1172.

respondent for its expenditures in such operation and, in addition, pay the respondent a fixed fee based upon the types and quantities of ammunition it supplied. The title to the site, plant, equipment and, in general, to the raw material, work in progress and finished munitions was to be in the Government.[4] Most of the materials were to be supplied by the Government. The contract provided expressly for the reimbursement of the respondent's expenses for labor. The respondent, in turn, agreed to supply practically all services incident to the setting up of an efficient operating force and to the operation of the plant until the required ammunition had been produced. The respondent was made responsible for storing the materials, supplies and finished ammunition and for loading the ammunition on cars or other carriers in accordance with the Government's instructions. The ammunition generally was shipped by common carrier on Government bills of lading to military destinations outside of Missouri. The Government reserved large rights of supervision, auditing and inspection to be exercised through its "Contracting Officer." The employees, including the petitioners, were to be hired, assigned, directed, supervised, paid and discharged by the respondent.

---

[4] Article III–F, ¶ 3 of the contract stated that:

"The title to all work under this contract, completed or in the course of construction or manufacture, and to all the Ammunition manufactured or in the process of being manufactured, shall be in the Government. Likewise, upon delivery at the site of the work, or at an approved storage site, title to all purchased materials, tools, machinery, equipment and supplies, for which the Contractor shall be entitled to be reimbursed under Title II hereof, shall vest in the Government. The Government shall bear all risk incident to such ownership. *These provisions as to title being vested in the Government shall not operate however, to relieve the Contractor from any duties imposed upon it under the terms of this contract.*" (Emphasis supplied.)

The contract stated expressly that all persons engaged in the work "shall be subject to the control and constitute employees of the Contractor . . . ." It quoted all of the "representations and stipulations" relating to employment directed by the Walsh-Healey Act.[5] Under it, the contracting officer (subject to a right of appeal) could require the respondent to dismiss any employee whom he deemed incompetent or whose retention "is deemed" not to be in the public interest. The contract made no express reference to the Fair Labor Standards Act. However, in a booklet which was distributed by the respondent, each employee at the St. Louis Ordnance Plant was informed, among other things, that "There will be eight hours in any working day, and forty hours will constitute a working week. . . . When production demands require a longer work day, or longer work week, the Company will pay the legal overtime rate *as provided under the Walsh-Healey Act, and the Fair Labor Standards Act.*" (Emphasis supplied.)

The 59 individual petitioners were employed in the safety department of the plant. They alleged that, under the Fair Labor Standards Act, they were entitled to overtime pay which they had not received. They sued in the United States District Court for the Eastern District of Missouri to recover that pay, plus liquidated damages and an attorney's fee. The respondent denied liability on many grounds, including those that the Fair Labor Standards Act did not apply to employees at the St. Louis Ordnance Plant and that, in any event, these petitioners were not entitled to any recovery under that Act. After trial, the District Court entered judgment in favor of the petitioners for the total sum of $246,251.44 (twice the amount of the overtime pay claimed), plus $24,625 as an attorney's

---

[5] Adopted June 30, 1936, 49 Stat. 2036, *et seq.*, 41 U. S. C. § 35, *et seq.*

fee and costs. The respondent moved for a new trial so that the Portal-to-Portal Act of 1947,[6] which had been adopted five days before the District Court's judgment, might be applied to the issues. The motion was denied and the case was appealed. While the appeal was pending in the United States Court of Appeals for the Eighth Circuit, the decision of this Court in *Kennedy* v. *Silas Mason Co., supra,* was announced. The Court of Appeals thereupon heard a reargument of this case with special reference to the issues raised in the *Silas Mason* case. Sitting *en banc,* it reversed the District Court and held that the Fair Labor Standards Act did not apply to employment at the St. Louis Ordnance Plant. 174 F. 2d 718. All seven judges held that the Walsh-Healey Act applied to such employment to the exclusion of the Fair Labor Standards Act. Four of those judges also joined in an opinion (p. 726) stating that the Act of July 2, 1940, had given discretion to the Secretary of War to determine what overtime regulations should be applicable to Government-owned privately operated plants and that, through his adoption of the Walsh-Healey Act, he had rendered the Fair Labor Standards Act inapplicable under this contract. The Court of Appeals did not reach the merits of the individual claims of the petitioners under the Fair Labor Standards Act. We granted certiorari. 338 U. S. 810.

## No. 79 (The Aaron Case).

This case presents substantially the same issue as that in the *Powell* case, but it relates to employees at the Arkansas Ordnance Plant. The issue arises on a summary judgment of the United States District Court for the Eastern District of Arkansas in favor of the respondent, rendered on pleadings, supporting affidavits, admis-

---

[6] 61 Stat. 84–90, 29 U. S. C. (Supp. III) §§ 216, 251–262.

sions of fact and answers to interrogatories. The plant was operated by the respondent under a cost-plus-a-fixed-fee contract entered into with the United States in July, 1941, and generally comparable, for present purposes, with that in the *Powell* case. The petitioners, 1,278 in number, were handlers, carriers and processors of explosives, who claimed additional compensation under the Fair Labor Standards Act for approximately 35 minutes before, and 30 minutes after, their scheduled work in the plant. The respondent answered and moved for summary judgment on three grounds—that the petitioners were not engaged in the kind of work that is covered by the Fair Labor Standards Act, that they are not within the coverage of the Act because they were employees of the United States, and that, by virtue of the Portal-to-Portal Act of 1947, they are not entitled to recover in any event.

In rendering judgment for the respondent, the District Court adopted its opinion in *Barksdale* v. *Ford, Bacon & Davis,* 70 F. Supp. 690. Without passing on other contentions, it there held that the Fair Labor Standards Act was not applicable because, in processing and assembling munitions under like conditions, the respondent had not been engaged "in the production of goods for commerce" within the meaning of that Act. The Court of Appeals for the Eighth Circuit affirmed, 174 F. 2d 730, on authority of its decision in the *Powell* case, *supra.* We granted certiorari. 337 U. S. 955.

## No. 58 (The Creel Case).

This case, from the Fifth Circuit, presents substantially the same issue as do the *Powell* and *Aaron* cases. The issue arises on a summary judgment in favor of the respondent, rendered by the United States District Court for the Eastern District of Texas on pleadings and supporting affidavits. Here the Lone Star Ordnance Plant,

near Texarkana, Texas, was owned by the Government and operated by the respondent under a cost-plus-a-fixed-fee contract entered into with the United States in July, 1941, comparable in its material features to those in the *Powell* and *Aaron* cases. The petitioners, several hundred in number, were employed at the plant in capacities such as those of truck drivers, lift-fork operators, loaders and unloaders. Their services were used in the production of munitions, such as shells, bombs, detonators and other ordnance items. The title to substantially all of the raw material, work in progress and finished products was in the Government. Most of the materials were furnished by the Government and the finished products were shipped in accordance with Government instructions on Government bills of lading to military destinations, usually outside of Texas. The petitioners sued for overtime pay claimed to be due them under the Fair Labor Standards Act. Quoting from the opinion of the District Court in the *Barksdale* case, *supra,* the trial court gave judgment for the respondent. The Court of Appeals for the Fifth Circuit affirmed. 171 F. 2d 964. It stated that the respondent, on the record before it, was an agency of the Government, was not an independent contractor and was not engaged in commerce within the meaning of the Fair Labor Standards Act. We granted certiorari. 337 U. S. 923. We heard this case with the *Powell* and *Aaron* cases.

The United States filed a brief and argued here, as *amicus curiae,* in support of the petitioners on the limited issue now before us.

## I. The Petitioners Were Not Employees of the United States Within the Meaning of the Fair Labor Standards Act.

If the petitioners were employees of the United States, the Fair Labor Standards Act excludes them from its

coverage.[7] A similar defense is presented through the claim that the respondents were not independent contractors but were agencies of the United States, representing and binding the United States as their principal in the employment of petitioners.

In each contract, there was a provision comparable to the following quoted from the contract in the *Powell* case:

"Article I–E—Authority of the Contractor.

"In carrying out the work under this Title I the Contractor is authorized to do all things necessary or convenient in and about the operating and closing down of the Plant, or any part thereof, including (but not limited to) *the employment of all persons engaged in the work hereunder, (who shall be subject to the control and constitute employees of the Contractor), . . . .*" (Emphasis supplied.)

Each contract is replete with references to the persons employed as the "employees of the Contractor" or "persons employed by the Contractor."

The contract in the *Powell* case contained the following additional clause:

"Article III–A—Status of Contractor.

"It is expressly understood and agreed by the Contractor and the Government that in the performance of the work provided for in this contract, *the Contractor is an independent contractor and in no wise an agent of the Government.*" (Emphasis supplied.)

---

[7] "SEC. 3. As used in this Act—

.        .        .        .        .

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but *shall not include the United States* or any State or political subdivision of a State, . . . .

"(e) 'Employee' includes any individual employed by an employer." (Emphasis supplied.) 52 Stat. 1060, 29 U. S. C. § 203 (d) and (e).

Such provisions are persuasive that the petitioners should be recognized here as employees of the respective respondents and the respondents as independent contractors. The respondents argue, however, that the context of the times, other provisions of the contracts and the practice under the contracts deprive these statements of their ordinary meaning. We find, on the contrary, that each of these sources supplies additional evidence that these provisions correctly state the true relationship between the petitioners and respondents.

For example, we find in these contracts a reflection of the fundamental policy of the Government to refrain, as much as possible, from doing its own manufacturing and to use, as much as possible (in the production of munitions), the experience in mass production and the genius for organization that had made American industry outstanding in the world.[8] The essence of this policy called for private, rather than public, operation of war production plants. This purpose shines through the following clause in the contract in the *Powell* case:

"Whereas, The Government *desires to have the Contractor, as an independent contractor on a cost-plus-a-fixed-fee basis, make all necessary preparations for the operation of said plant, including the training of operating personnel* . . . but excluding the procurement and supervision of the installation of manufacturing facilities [to be done, under a like contract, by the contractor's parent corporation, Western Cartridge Company]; *and operate said plant;* . . . ." (Emphasis supplied.)

It would have been simple for the Government to have ordered all of this production to be done under gov-

---

[8] For a review of the development of the war production program and its reliance on private industry, see *Lichter* v. *United States,* 334 U. S. 742, 758–766.

ernmental operation as well as under governmental ownership. To do so, however, might have weakened our system of free enterprise. We relied upon that system as the foundation of the general industrial supremacy upon which ultimate victory might depend. In this light, the Government deliberately sought to insure private operation of its new munitions plants.

In these great projects built for and owned by the Government, it was almost inevitable that the new equipment and materials would be supplied largely by the Government and that the products would be owned and used by the Government. It was essential that the Government supervise closely the expenditures made and the specifications and standards established by it. These incidents of the program did not, however, prevent the placing of managerial responsibility upon independent contractors.

The relationship of employee and employer between the worker and the contractor appears not only in the express terminology that has been quoted. It appears in the substantial obligation of the respondent-contractors to train their working forces, make job assignments, fix salaries, meet payrolls, comply with state workmen's compensation laws and Social Security requirements and "to do all things necessary or convenient in and about the operating and closing down of the Plant, . . . ." [9]

[9] If the workers were employees of the United States, state workmen's compensation laws and other comparable laws would be inapplicable. In the St. Louis and Arkansas Ordnance plants the contractor, in order to explain the relationships being established, issued a booklet to each new employee. The manual thus used at the St. Louis plant is entitled "Your Job with the St. Louis Ordnance Plant." It opens with the statement "Every prospective *employee of United States Cartridge Company* should read this booklet describing the Company's policy and procedure." (Emphasis supplied.) It describes the relationship between the United States Government, the company and "Our Employees." For example, it says "The Com-

The insertion in each of these contracts of the representations and specifications that are set forth in the Walsh-Healey Act was, in itself, a recognition by the Secretary of War of the independent contractor status of the respondents.

The petitioner-employees and the Government expressly disavow, in their briefs, any employment relationship between them. The managerial duties imposed upon the respondents were the duties of employers. That such duties be performed by private contractors was a vital part of the Government's general production policy. In the light of these considerations, we conclude that the respective respondents, in form and in substance, were the employers of these petitioners within the meaning of the Fair Labor Standards Act.[10]

---

pany . . . is responsible to the United States Government for ammunition production, to the City of St. Louis in maintaining a successful civic enterprise, and to our employees, for the establishment of working conditions conducive to the health and happiness of each man and woman employed in the plant." It explains the financial basis of its cost-plus contract of management as follows: "In the final analysis, your wages come from the United States Government, whose only source of income is taxes collected from you and all other citizens. The United States Cartridge Company is merely managing the plant for the Federal Government." It adds that "When production demands require a longer work day, or longer work week, the Company will pay the legal overtime rate as provided under the Walsh-Healey Act, and the Fair Labor Standards Act."

[10] See the dissenting opinion of Circuit Judge Hutcheson in *Kennedy v. Silas Mason Co.,* 164 F. 2d 1016, 1019–1920 (C. A. 5th Cir.), the reasoning of which is in accord with our decision: "Here the whole elaborate system was designed and operated so that the United States should not be the employer." *Id.* at p. 1020. Cf. *Curry* v. *United States,* 314 U. S. 14, and *Alabama* v. *King & Boozer,* 314 U. S. 1. Those cases held that the contractors, under Government cost-plus-a-fixed-fee contracts, were, as such, subject to state use taxes and state sales taxes.

## II. Petitioners Were Engaged in the Production of Goods for Commerce Within the Meaning of the Fair Labor Standards Act.

Before discussing the definitions assigned by the Act to the words "commerce" and "goods," it is helpful to examine the Act as a whole in the light of the time of its adoption. It was adopted in 1938, during an industrial depression. It expressly stated its purposes.[11] This Court has further expounded them.[12] In this Act, the

---

[11] "Sec. 2. (a) *The Congress hereby finds that the existence, in industries engaged* in commerce or *in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers* (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) *leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce;* and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power." (Emphasis supplied.) 52 Stat. 1060, 29 U. S. C. § 202.

[12] While one major means of spreading substandard labor conditions was recognized to be through the lowering of prices for goods produced under substandard conditions, there has been no attempt in the Act, or in this Court's discussion of the Act, to limit its coverage to employees engaged in producing goods solely for competitive markets. An announced purpose of the Act was to raise living standards and to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . ." (§ 2 (a), see note 11, *supra.*) That purpose was concerned directly with any widespread existence of substandard wages, hours or working conditions. That such conditions could be reached by Congress through its regulation of inter-

510

primary purpose of Congress was not to regulate interstate commerce as such.  It was to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation.  It sought to raise living standards without substantially curtailing employment or earning power.

state transportation of the products of those conditions had been forcefully stated in the dissent of Mr. Justice Holmes in *Hammer* v. *Dagenhart*, 247 U. S. 251, 277–281.  In 1941, this Court expressly approved that reasoning and upheld the constitutionality of the Fair Labor Standards Act.  *United States* v. *Darby*, 312 U. S. 100, 115–117.  The language of Mr. Justice Stone in speaking for the Court in that case is significant.  It extended to interstate shipments and transportation of proscribed products in general:

"While manufacture is not of itself interstate commerce, the shipment of manufactured goods interstate is such commerce and the prohibition of such shipment by Congress is indubitably a regulation of the commerce. . . .  It is conceded that the power of Congress to prohibit transportation in interstate commerce includes noxious articles, *Lottery Case, supra* [188 U. S. 321]; *Hipolite Egg Co.* v. *United States*, 220 U. S. 45; cf. *Hoke* v. *United States, supra* [227 U. S. 308]; stolen articles, *Brooks* v. *United States*, 267 U. S. 432; kidnapped persons, *Gooch* v. *United States*, 297 U. S. 124, and articles such as intoxicating liquor or convict made goods, traffic in which is forbidden or restricted by the laws of the state of destination.  *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.*, 299 U. S. 334.

.        .        .        .        .

"Whatever their motive and purpose, regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause.  Subject only to that limitation, . . . we conclude that the prohibition of the shipment interstate of goods produced under the forbidden substandard labor conditions is within the constitutional authority of Congress.

.        .        .        .        .

"The obvious purpose of the Act was not only to prevent the interstate transportation of the proscribed product, but to stop the initial step toward transportation, production with the purpose of so transporting it."  *United States* v. *Darby, supra,* at pp. 113, 115, 117.

For further legislative history of the Act, see *Roland Electrical Co.* v. *Walling*, 326 U. S. 657, 668–669, n. 5.

*Roland Electrical Co.* v. *Walling,* 326 U. S. 657, 669–670. The Government's munitions plants provided an appropriate place for the beneficial application of the Act's standards of working conditions without danger of reduced employment through loss of business. This Act would fail materially in its purpose if it did not reach the producers of the tremendous volume of wartime goods destined for interstate transportation. In 1941–1945 the manufacture of munitions was a major source of employment. Wages and hours in that industry were a major factor in fixing the living standards of American labor.

A. *The "transportation" of munitions of the United States to destinations outside of the state of their production is "commerce" within the meaning of the Act.* The Act applies to "employees . . . engaged in commerce or in the production of goods for commerce." [13] The precise question here is whether the munitions were produced for "commerce" when such production was for transportation outside of the state and for use by the United States in the prosecution of war, but not for sale or exchange.

Section 3 (b) of the Act contains the following definition of "commerce":

> "(b) 'Commerce' means trade, commerce, *transportation,* transmission, or communication among the several States or *from any State to any place outside thereof.*" (Emphasis supplied.)   52 Stat. 1060, 29 U. S. C. § 203 (b).

---

[13] "SEC. 6. (a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce [certain minimum wages] . . . .

"SEC. 7. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce [longer than certain maximum hours] . . . ."   52 Stat. 1062, 1063, 29 U. S. C. §§ 206 (a) and 207 (a).

This definition is an exercise by Congress of its constitutional power "To regulate Commerce with foreign Nations, and among the several States, . . . ." U. S. Const. Art. I, § 8, Cl. 3. Such power has been held repeatedly to include the power to regulate interstate shipments or transportation as such, and not merely to regulate shipments or transportation of articles that are intended for sale, exchange or other trading activities.[14]

Congress could have expressly exempted from the Act employees engaged in producing goods for interstate transportation not leading to a sale or exchange. Congress also could have exempted employees engaged in producing munitions for use by the United States in war, rather than for sale or exchange by it. Congress might even have exempted all employees producing goods in any Government-owned plants. However, Congress stated no such exemptions. On the contrary, Congress included, by express definition of terms, employees engaged in the production of goods for interstate *transportation*.

In view of these considerations, we find no merit in an interpretation of the Act which would exclude from its coverage those employees who were engaged in the production of munitions for interstate transportation for use or consumption, as distinguished from transportation of them for sale or exchange.

B. *The munitions produced were "goods" within the meaning of the Fair Labor Standards Act.* The respondents argue that, even though the munitions were produced for commerce, they were not "goods" within the meaning of the Act. Section 3 (i) defines "Goods" as follows:

---

[14] *E. g., Edwards* v. *California,* 314 U. S. 160; *Gooch* v. *United States,* 297 U. S. 124; *Thornton* v. *United States,* 271 U. S. 414; *Brooks* v. *United States,* 267 U. S. 432; *United States* v. *Hill,* 248 U. S. 420; *Caminetti* v. *United States,* 242 U. S. 470. See also, *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 549; *Bell* v. *Porter,* 159 F. 2d 117, 118–119 (C. A. 7th Cir.).

"(i) 'Goods' means goods (including ships and marine equipment), wares, *products,* commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but *does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof* other than a producer, manufacturer, or processor thereof." (Emphasis supplied.) 52 Stat. 1061, 29 U. S. C. § 203 (i).

Respondents claim that this language excludes the petitioners from the coverage of the Act because the petitioners were engaged in producing munitions which thereafter, and prior to their interstate transportation, were to be delivered to the United States as the ultimate consumer. This interpretation would deprive the original jurisdictional fact—that at the time the munitions were produced they were intended for interstate transportation—of its covering effect merely because those munitions, upon a later delivery to the United States, would then cease to be "goods" within the meaning of the Act.

We believe that the crucial fact which establishes the coverage of the Act is the status of the munitions, as "goods," during the time they were being produced. The literal meaning of the exclusionary clause in § 3 (i), and that which best serves the purposes of the Act, is merely that, after the products shall have been delivered into the actual physical possession of their ultimate consumer, they then shall cease to be "goods." This retains the important effect that, thereafter, it is not a violation of § 15 (a) (1)[15] for the ultimate consumer to transport the

---

[15] "SEC. 15. (a) . . . it shall be *unlawful for any person—*

"(1) *to transport,* offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, *any goods* in the

products outside of the state. This interpretation was adopted by the Wage and Hour Administrator. 1940 WH Man. 131, 133. It was readopted without change in the July, 1947, revision of the Administrator's Interpretations. 12 Fed. Reg. 4585, 29 C. F. R. § 776.7 (h).[16]

We hold, therefore, that the fact that the munitions were produced for delivery, into the actual physical pos-

production of which any employee was employed in violation of section 6 [minimum wages] or section 7 [maximum hours], . . . .

.      .      .      .      .

"SEC. 16. (a) Any person who willfully violates any of the provisions of section 15 shall upon conviction thereof be subject to a fine of not more than $10,000, or to imprisonment for not more than six months, or both. . . ." (Emphasis supplied.) 52 Stat. 1068, 1069, 29 U. S. C. §§ 215 (a) (1) and 216 (a).

[16] "Irrespective of the question as to who is the ultimate consumer, however, it is our opinion that the employees of the container manufacturer are subject to the act. The fact that products lose their character as 'goods' when they come into the actual physical possession of the ultimate consumer does not affect the coverage of the act as far as the employees producing the products are concerned. The facts at the time that the products are being produced determine whether an employee is engaged in the production of goods for commerce, and at the time of the production of the containers they were clearly 'goods' within the meaning of the statute since they were not, at that point of time, in the actual physical possession of the ultimate consumer. All that the term 'goods' quoted above is intended to accomplish is to protect ultimate consumers, other than producers, manufacturers, or processors of the goods in question from the 'hot goods' provision of section 15 (a) (1). This seems clear from the language of the statute. . . . But Congress clearly did not intend to permit an employer to avoid the minimum wage and maximum hours standards of the act by making delivery within the State into the actual physical possession of the ultimate consumer who transports or ships the goods outside the State. Thus, it is our opinion that employees engaged in building a boat for delivery to the purchaser at the boatyard are within the coverage of the act if the employer, at the time the boat is being built, intends, hopes, or has reason to believe that the purchaser will sail it outside the State." 29 C. F. R. § 776.7 (h).

session of the United States as their ultimate consumer, before their subsequent interstate shipment, does not deprive the employees who produced the munitions of the benefits of the Fair Labor Standards Act. It is not material whether such interstate transportation was to take place before or after the delivery of the munitions to the United States. In either event, the employees were engaged in the production of "goods" for "commerce." To hold otherwise would restrict the Act not only arbitrarily but also inconsistently with its broad purposes.

### III. THE WALSH-HEALEY ACT AND THE FAIR LABOR STANDARDS ACT ARE NOT MUTUALLY EXCLUSIVE.

The Walsh-Healey Act was adopted about one year after the National Industrial Recovery Act [17] had been declared unconstitutional. *Schechter Corp.* v. *United States,* 295 U. S. 495. Seeking then to regulate wages and hours of employees, the Walsh-Healey Act kept within a narrow field of assured constitutionality. It prescribed that, in Government contracts for the manufacture or furnishing of materials, supplies, articles and equipment in any amount exceeding $10,000, the contractor pay its employees not less than the minimum wages determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work in the locality. It prescribed also that no such employees be permitted to work in excess of eight hours in any one day or in excess of 40 hours in any one week,[18]

---

[17] 48 Stat. 195.

[18] This clause was amended in 1942 by adding the following: *"Provided,* That the provisions of this subsection [c] shall not apply to any employer who shall have entered into an agreement with his employees pursuant to the provisions of paragraphs 1 or 2 of subsection (b) of section 7 of an Act entitled 'Fair Labor Standards Act

that no male person under 16 years of age, no female person under 18 years of age and no convict labor be employed by the contractor, and that no part of the contract be performed or any of the material, supplies, articles or equipment be manufactured or fabricated under working conditions unsanitary, hazardous or dangerous to the health and safety of the employees.

The Fair Labor Standards Act of 1938 was passed nearly two years later by the next Congress. It presented a different and broader approach. It was not restricted to public contracts. The sponsor of the bill stated that it was intended to carry out the suggestions made by the President in his message to Congress. 81 Cong. Rec. 4960, 4961 (1937). In that message, the President said:

". . . to protect the fundamental interests of free labor and a free people we propose that only goods which have been produced under conditions which meet the minimum standards of free labor shall be admitted to interstate commerce. Goods produced under conditions which do not meet rudimentary standards of decency should be regarded as contraband and ought not to be allowed to pollute the channels of interstate trade."

The Act declared its purposes in bold and sweeping terms.[19] Breadth of coverage was vital to its mission. Its scope was stated in terms of substantial universality amply broad enough to include employees of private con-

---

of 1938'." 56 Stat. 277, 41 U. S. C. § 35 (c). Those paragraphs relate to collective bargaining agreements covering 26 or 52 consecutive workweeks and exempting the employer making them from charges of violation of the usual maximum hour provisions of the Fair Labor Standards Act. This amendment thus recognized the application of the Fair Labor Standards Act to employment to which the Walsh-Healey Act also applied.

[19] See note 11, supra.

tractors working on public projects as well as on private projects. Where exceptions were made, they were narrow and specific. It included as employees "any individual employed by an employer" (§ 3 (e)), and defined an employer so as amply to cover an individual or corporation employing persons on public contracts, while expressly excluding, *as an employer,* "the United States or any State or political subdivision of a State, . . ." (§ 3 (a) and (d)). It devoted § 13 to listing *exemptions of specific classes of employees.* For example, it exempted any seaman, any employee of a carrier by air subject to Title II of the Railway Labor Act and any employee employed in agriculture. It exempted certain employees under § 204 of the Motor Carrier Act, 1935,[20] but limited their exemption to the maximum hour provisions in § 7. It also exempted any employee of an employer subject to Part I of the Interstate Commerce Act. Such specificity in stating exemptions strengthens the implication that employees not thus exempted, such as employees of private contractors under public contracts, remain within the Act.

The Act includes the following affirmative statement as to the relation of its provisions to other laws:

"RELATION TO OTHER LAWS

"SEC. 18. No provision of this Act or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this Act or a maximum workweek lower than the maximum workweek established under this Act, and no provision of this Act relating to the employment of child labor shall justify non-

---

[20] See *Pyramid Motor Corp.* v. *Ispass,* 330 U. S. 695; *Levinson* v. *Spector Motor Service,* 330 U. S. 649; *Southland Gasoline Co.* v. *Bayley,* 319 U. S. 44; *Overnight Motor Co.* v. *Missel,* 316 U. S. 572; *United States* v. *American Trucking Assns.,* 310 U. S. 534.

compliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this Act. No provision of this Act shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under this Act, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under this Act." 52 Stat. 1069, 29 U. S. C. § 218.

The above language discloses a congressional awareness that the coverage of the Fair Labor Standards Act overlaps that of other federal legislation affecting labor standards. In other enactments we find collateral recognition that the Walsh-Healey Act might apply to the same employment as the Fair Labor Standards Act. An amendment to the Walsh-Healey Act, in 1942, recognized this possibility.[21] Similarly, the Portal-to-Portal Act of 1947 indicated that persons employed by Government contractors, and thus protected by the Walsh-Healey Act, were entitled to the benefits of the Fair Labor Standards Act.[22]

---

[21] See note 18, *supra.*

[22] "SECTION 1. (a) The Congress hereby finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, . . . (9) the cost to the Government of goods and services heretofore and hereafter purchased by its various departments and agencies would be unreasonably increased and *the Public Treasury would be seriously affected by consequent increased cost of war contracts;* . . . .

. . . . .

"The Congress further finds and declares that all of the results which have arisen or may arise under the Fair Labor Standards Act of 1938, as amended, as aforesaid, may (except as to liability for liquidated damages) arise with respect to the Walsh-Healey and

Despite evidence that the two statutes define overlapping areas, respondents contend that they should be construed as being mutually exclusive. There has been no presentation of instances, however, where compliance with one Act makes it impossible to comply with the other. There has been no demonstration of the impossibility of determining, in each instance, the respective wage requirements under each Act and then applying the higher requirement as satisfying both.

The Government has presented, as a considered analysis of the overlapping effects of these Acts, excerpts from the Manual of Instructions for the Administration of Contracts (War Department, Office of the Chief of Ordnance, 1941). These are published in the appendix to the brief of the United States. Their forthright treatment and detailed suggested solutions of the practical aspects of the supplementary use of the two Acts are impressive.

In some, and probably most, instances, the "prevailing minimum wages" required by the Walsh-Healey Act were more advantageous to employees than the minimum wages prescribed by the Fair Labor Standards Act at the times here under review.[23] On the other hand, the remedial procedure under the later Act was generally more advantageous to employees than the procedure under the earlier Act.

We conclude that the Acts are not mutually exclusive. The applicability of the Walsh-Healey Act to the con-

---

Bacon-Davis Acts and that it is, therefore, in the national public interest and for the general welfare, essential to national defense, and necessary to aid, protect, and foster commerce, that this Act shall apply to the Walsh-Healey Act and the Bacon-Davis Act." (Emphasis supplied.) 61 Stat. 84–85, 29 U. S. C. (Supp. III) § 251 (a).

[23] The 1949 amendments to the Fair Labor Standards Act, including especially the increase of minimum wages from 40 cents to 75 cents an hour, demonstrate, however, the growing importance of the application of the Fair Labor Standards Act. 63 Stat. 446, 910–920, 29 U. S. C. (Supp. III) § 202, et seq., especially § 206 (a) (1).

tracts before us therefore does not preclude the application of the Fair Labor Standards Act to employees under the same contracts. We find the Acts to be mutually supplementary.

IV. Neither the Act of July 2, 1940, nor the Action of the Secretary of War Taken Pursuant to it Excludes the Applicability of the Fair Labor Standards Act.

We find in the Act of July 2, 1940,[24] no such recognition of the uniqueness of War Department contracts for the private operation of Government-owned munitions plants as is claimed in the concurring opinion below in the *Powell* case.[25] Without more specific provisions than this Act contains, we cannot interpret it as excluding, or as granting, authority to executive officers to exclude, employees in such plants from the benefits of the general wage and hour provisions which Congress has established in the Walsh-Healey Act and more fully and recently in the Fair Labor Standards Act.

The purposes of this temporary Act of 1940 were the clarification of the contract-making authority of the War Department under existing general law, with such exceptions as were expressly noted, the elimination of certain hazards, and the making of additional grants of emergency authority to the President. For example, this Act referred expressly to the Walsh-Healey Act as applicable to the new War Department contracts when entered into with or without advertising. This was helpful because, when the Walsh-Healey Act was adopted, the contracts to which it applied did not include contracts negotiated without advertising for competitive bids. Similarly, the 1940 Act expressly suspended certain specific limitations on the War Department, *e. g.,* requirements of the congressional

---

[24] 54 Stat. 712–714, 50 U. S. C. App. §§ 1171, 1172.
[25] 174 F. 2d 718, 726–730.

approval of estimates and the making of appropriations prior to undertaking construction of certain buildings (§ 1 (a)), restrictions on leasing (§ 1 (b)), restrictions on the assignment of personnel (§ 2 (b)), limitations on the number of serviceable aircraft (§ 3), and restrictions as to civil service employees (§ 4 (a)). No suggestion was made of a suspension of part or all of the Fair Labor Standards Act, nor was anything authorized that would violate that Act.

The single reference made in the 1940 Act to the Walsh-Healey Act was to insure the applicability of the latter Act to negotiated contracts. This appears from the following revealing statement made on the floor of the Senate by Senator Wagner, the author of the amendment containing the reference:

"A question has arisen—*and the amendment is simply to remove the ambiguity*—as to whether the Walsh-Healey Act, which is now definitely applicable to a contract for the purchase of supplies as a result of advertising, will also apply to a negotiated contract. . . .

". . . Unless this amendment is adopted we would have this anomalous situation: Under a contract entered into with the Government as the result of public bidding one set of minimum wages, that is, the prevailing wages [under the Walsh-Healey Act], would be applied, whereas under another contract entered into as a result of negotiations, *a much lower minimum wage would be paid, that is, the flat minimum under the Wage and Hour Act* [the Fair Labor Standards Act]. This situation would present an opportunity for exploitation, since a contractor under a negotiated contract might be paying wages in some instances 25 percent to 75 percent below those required under the Healey-Walsh Act. I am sure that we would not want to invite any such exploitation." (Emphasis supplied.)   86 Cong. Rec. 7924 (1940).

See also, 86 Cong. Rec. 7839–7843, and H. R. Rep. No. 2685, 76th Cong., 3d Sess. 1 (1940).

We have considered the other contentions of the respondents, including the weight to be given to the Statement of Labor Policy issued by the War and Navy Departments in 1942,[26] but we do not find in them a convincing refutation of the foregoing conclusions. We, accordingly, find that the Fair Labor Standards Act of 1938, as amended, is applicable to the issues presented in each of the instant cases. We do not reach the validity of the individual claims of the petitioners made in reliance upon that Act.

In No. 96, *Powell et al.* v. *The United States Cartridge Company,* the judgment of the Court of Appeals is reversed and the cause is remanded to that court for further consideration of the errors asserted on appeal but not reviewed by that court.

In No. 79, *Aaron et al.* v. *Ford, Bacon and Davis,* and in No. 58, *Creel* v. *Lone Star Defense Corporation,* the judgments of the respective Courts of Appeals are reversed and the causes are remanded to the respective District Courts for further proceedings in conformity with this opinion.

*It is so ordered.*

Mr. Justice Douglas and Mr. Justice Clark took no part in the consideration or decision of any of these cases.

Mr. Justice Frankfurter, whom Mr. Justice Jackson joins, dissenting.

These cases do not present just another one of those situations in the long series in which the Court has been

---

[26] This Statement of Labor Policy was emphasized by counsel for the respondent in the *Aaron* case. Much of it is published in Regulations—Army: Ordnance Procurement Instructions, 2 CCH War Law Serv. §§ 9,101.1, 9,104.3, 9,104.4, 9,105.2 and 9,105.3.

called upon to give a sympathetic construction to the
Fair Labor Standards Act. We do not here have a controversy involving relations between a capitalist employer
and his employees. The real controversy is between the
Department of the Army which conceived, formulated,
and administered a scheme for the production of war
matériel by means of Government-owned plants and the
Wage and Hour Division of the Department of Labor
which administers the Fair Labor Standards Act. We
do not have here, in short, the resistance of private employers to the demands of their employees. Here a vast
claim on the Treasury of the United States is in issue.
The issue should be decided in light of the fact that Congress has manifested in the most emphatic way that the
Fair Labor Standards Act is not to be stretched to the
extent that sophistical argumentation can stretch its
scope but is to be applied in a commonsensical way.[1]
Fine distinctions in the application of the statute can
hardly be avoided. That makes it all the more necessary to hew close to the line marked out by the specific
facts of the cases before us. The caution that general
propositions do not decide concrete cases is particularly
to be heeded in dealing with an enactment framed in
terms of legal categories having diverse and conflicting
contents. It begs the real question to purport to solve
a particular problem merely by invoking such a category.

---

[1] Congress found that the construction which this Court placed
upon the Fair Labor Standards Act in *Jewell Ridge Coal Corp.* v.
*Local No. 6167*, 325 U. S. 161, *Anderson* v. *Mt. Clemens Pottery
Co.*, 328 U. S. 680, *Bay Ridge Operating Co.* v. *Aaron*, 334 U. S.
446, *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S. 697, and *Farmers
Reservoir and Irrigation Co.* v. *McComb,* 337 U. S. 755, misconceived
the purposes of Congress. See Portal-to-Portal Act of 1947, 61 Stat.
84, 29 U. S. C. (Supp. III) § 251 *et seq.;* Act of July 20, 1949, 63
Stat. 446, 29 U. S. C. (Supp. III) § 207 (e) (1), (2), (f); Fair Labor
Standards Amendments of 1949, §§ 11, 14, 63 Stat. 910, 917, 919, 29
U. S. C. (Supp. III) §§ 213, 216.

Not only is it important to be heedful of what these cases are really about; it is no less important to be mindful of what they are not about. The problem before us is not the applicability of the Fair Labor Standards Act to work done under all Government contracts, or even to work under all varieties of war production contracts, cost-plus-fixed-fee or otherwise. What is involved is the particular kind of cost-plus-fixed-fee contracts for the operation of ordnance plants under the Act of July 2, 1940, which authorized the Secretary of War to provide for the operation of such plants "through the agency of selected qualified commercial manufacturers." [2] 54 Stat. 713, 50 U. S. C. App. § 1171 (b).

An analysis of the nature of the interrelationship of Government, contractor and employees is necessary to put the issues in their proper perspective. The facts are substantially the same in all three cases, but since the findings in No. 79, *Aaron* v. *Ford, Bacon & Davis, Inc.*, are particularly detailed, further discussion will center on that case.

The United States contracted with respondent Ford, Bacon & Davis, Inc. in July, 1941, for the operation of the Government-owned Arkansas Ordnance Plant and production there of munitions for war—detonators, percussion elements, artillery primers, fuses, boosters and powder train fuses. The plant was a military reservation under the immediate control of an ordnance officer designated by the Chief of Ordnance. Munition quotas and specifications were set by the Government, and inspection by Government officials at each stage of production checked compliance with rules promulgated by the Government not merely as to safety but as to production

---

[2] The Secretary of the Navy was authorized to enter into contracts for private operation of Navy installations on a cost-plus-fixed-fee basis by §§ 2 (a) and 8 (b) of the Act of June 28, 1940. 54 Stat. 677, 680, 50 U. S. C. App. §§ 1152 (a) (1), 1158 (b).

as well. The contract was terminable at will by the Government and under it the "normal factors which go to make up commercial profit are lacking." War and Navy Departments' Statement of Labor Policy Governing Government-Owned, Privately Operated Plants (1942), digested in 2 CCH War Law Serv. ¶24,862 *et seq.* The United States owned all materials and equipment used in connection with the operation of the plant. Ninety-five per cent were furnished by the Government directly; the remainder was obtained by the contractor after approval by the Government. The United States obtained title to the latter purchases at the point of origin, and shipment to the plant was on Government bills of lading at a reduced rate and without payment of transportation tax. Title to all materials, equipment, and work in process in the plant was at all times in the United States. Finished products were shipped out of Arkansas to military facilities on Government bills of lading.

Under the contract the Government paid all expenses of operating the plant, including labor costs. The contractor was even allowed costs of production of munitions that did not meet specifications and could not be used. The Government contracted for electric power, telephone, teletype and telegraph services itself and paid the bills directly, and provided employees traveling on business with tax-free transportation tickets. At no time did the contractor have to advance its own money—expenses were paid out of available Government funds. For its services in operating the plant, the contractor was paid a fixed fee.

The War and Navy Departments' Statement of Labor Policy forbade agreements between the contractor and personnel "which, in the opinion of either the Secretary of War or the Secretary of the Navy, will have the effect of restricting or hampering maximum output." Although the contract provided that the contractor was to hire all employees and that they were to be "subject to

the control and constitute employees of the Contractor," the Government retained the right to approve or disapprove the employment of all personnel and could require the dismissal of any employee deemed "incompetent or whose retention is deemed to be not in the public interest." No key employee could be assigned to service until the Contracting Officer approved a statement submitted to him on the employee's previous and proposed salary, qualifications and experience. All wage and salary rates and other changes in status were subject to Government approval, and the Government audited in advance of payment all time cards and payrolls and witnessed the actual payment to employees. The requirement of approval of wage rates was neither a dead letter nor a formality. Proposed wage scales were in fact rejected by the War Department.

Work under the contract was specifically made subject to the Walsh-Healey Act, 49 Stat. 2036, 41 U. S. C. § 35 *et seq.* This statute was enacted by Congress after the National Industrial Recovery Act was invalidated, with a view to directing "Government purchases along lines tending to maintain the advance in wages and purchasing power achieved under the N. R. A." S. Rep. No. 1157, 74th Cong., 1st Sess. 1 (1935). See also S. Rep. No. 1193, 74th Cong., 1st Sess. (1935); H. R. Rep. No. 2946, 74th Cong., 2d Sess. (1936). To that end, § 1 (b) requires that employees of Government contractors be paid not less than the "prevailing minimum wage for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished." Provision is also made, *inter alia,* for maximum hours, with overtime permitted at "not less than one and one-half times the basic hourly rate." Pursuant to § 2 of the statute the contract made the contractor liable to the

United States for any underpayment of wages for the benefit of underpaid employees.[3]

Two years after the Walsh-Healey Act became law, Congress by the Fair Labor Standards Act of 1938 fixed specific minimum hourly wages and maximum hours for employees "engaged in commerce or in the production of goods for commerce." 52 Stat. 1062, 1063, 29 U. S. C. §§ 206, 207. Section 16 (b) of that Act gives employees a right of action against their employer for unpaid minimum wages or overtime compensation and for "an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

The Court now holds that the Fair Labor Standards Act is applicable to employees of cost-plus-fixed-fee contractors irrespective of the ultimate liability of the United States under the contracts for whatever sums are recovered in these suits. As we said in *Kennedy* v. *Silas Mason Co.*, 334 U. S. 249, 254, the contractor "in a sense, is no more than a nominal defendant, for it is entitled to reimbursement from the Government." The reach of the liability which today's decision establishes is indicated by the agreed statement that in the *Aaron* case alone, a "conservative estimate of the total amount in suit, exclusive of liquidated damages and costs, is in excess of

---

[3] Section 2 provides: "Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of said contract . . . may be withheld from any amounts due on any such contracts or may be recovered in suits brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees . . . on whose account such sums were withheld or recovered."

$500,000.00." It was estimated by the Secretary of War in 1946 that the amount at stake in "existing suits and potential suits . . . may in the aggregate exceed $250,000,000, substantially all of which will be reimbursable to the contractors." [4] The Court creates such a drain on the Treasury by imputing to the Congress which enacted the Fair Labor Standards Act—and which of course could not possibly have foreseen the cost-plus-fixed-fee arrangements involved here—the intention, in effect, to open the Treasury not only to huge claims for overtime but in addition to demands for like amounts as "liquidated damages," and attorneys' fees. In the absence of a shred of evidence to indicate that Congress contemplated such a result or would have countenanced it, I cannot bring myself to attribute to Congress the desire to place such a double burden upon the fisc.

Certainly such a result should have a more salient justification than abstract argumentation about words not having fixed scope or function. Our decisions have made one thing clear about the Fair Labor Standards Act: its applicability is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes. *Rutherford Food Corp.* v. *McComb,* 331 U. S. 722; *Walling* v. *Portland Terminal Co.,* 330 U. S. 148, 150; *McComb* v. *McKay,* 164 F. 2d 40; cf. *United States* v. *United Mine Workers,* 330 U. S. 258, 285–86. Unless we are to disregard this guidance of wisdom in construing so dynamic a code as the Fair Labor Standards Act, designation in the contracts of the contractors as the "employers"

---

[4] Under the Fair Labor Standards Act even employers who acted with the utmost good faith are liable for liquidated damages and attorneys' fees in addition to unpaid minimum wages or overtime compensation. The severe impact a large, unforeseen nonreimbursed liability would have upon a fixed-fee contractor receiving an annual fee of $420,000 as in the *Aaron* case is manifest.

of the personnel in the ordnance plants cannot be decisive. Again, the bare words of the definitions in that Act, never self-applying in particular cases, are especially inconclusive here because the cost-plus-fixed-fee arrangements adopted for the operation of these plants were of such an unprecedented character. We are dealing with economic arrangements which in their scope and incidence were aptly characterized by the War and Navy Departments' Statement of Labor Policy: "The industrial units thus created are unique." In such unique situations especially we should heed our admonition against perverting "the process of interpretation by mechanically applying definitions in unintended contexts." *Farmers Reservoir & Irrigation Co.* v. *McComb,* 337 U. S. 755, 764. In law as elsewhere words of many-hued meanings derive their scope from the use to which they are put.

No doubt, as suggested, the purpose of the Fair Labor Standards Act should guide our reading of it. The aim of the Act, set forth in § 2 (a), is to eliminate "in industries engaged in commerce or in the production of goods for commerce . . . labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." But to find that this Act does not fit the contracts in suit neither negatives congressional concern for the welfare of the employees involved nor deprives them of protection consonant with the humane motives underlying the Act. The Walsh-Healey Act itself serves as proof of congressional provision for civilized standards for employees carrying out Government contracts. Pursuant to that statute, the policy under the contracts here was to pay time and one-half for overtime to employees in nonsupervisory classifications. The degree of control exerted by the Government over working conditions and wage rates, Government audit of time cards and payrolls, the presence of Government officers at the time employees

were paid, and the power of the Government to with-hold payments otherwise due the contractor or to sue for departure from specified standards and use the recovery to compensate aggrieved employees furnished a scheme of safeguards to assure fair dealing.

It is said that the Fair Labor Standards Act has been interpreted administratively as covering the employees in these cases. But the agency of Government charged with the formulation and supervision of these contracts, the Department of the Army, supports the position of the contractors here. Correspondence between the War and Navy Departments and the Attorney General in 1944 shows that initial reluctance of the two Departments to have suits against cost-plus-fixed-fee contractors un-der the Fair Labor Standards Act defended on the basis of the inapplicability of the statute did not stem from lack of conviction about the validity of the defense. Rather, the War and Navy Departments feared that its successful assertion would have significant implications for the construction of the National Labor Relations Act and would "result in an impairment of the jurisdiction of the National Labor Relations Board over war plants or cause a substantial legal doubt to be cast upon such juris-diction." This fear was engendered by the unresourceful advice of a Government lawyer as to the subjection of the employment under these contracts to the collective-bar-gaining policy of the Wagner Act if the Fair Labor Stand-ards Act was not applicable. In view of such advice, the War and Navy Departments concluded that the interest in efficient prosecution of the war would best be served by preserving at war plants the degree of supervision over labor relations embodied in the National Labor Relations Act even at the expense of abandoning attacks upon the applicability of the Fair Labor Standards Act to cost-plus-fixed-fee contractors. See also 22 Comp. Gen. 277. To find "administrative interpretation" in a decision of Gov-

ernment departments, acting under legal advice, that a concession as to a statute's applicability was an expedient step in the war production program is to disregard the justification for utilizing "administrative interpretation" as a gloss on ambiguous legislation.

The Government exerted close supervision over every phase of operations at these ordnance plants, specifying articles to be manufactured, production quotas and methods of production. Government control was particularly dominant with respect to personnel policies, including phases of hiring and firing, job assignments, working conditions, wage rates, and overtime compensation. The investment in plant and facilities was entirely the Government's, and the Government bore all the expenditures and all the risks of operation. As between the contractors and the workers, the operation was wanting in the characteristic aspects of the normal employer-employee relation. In view of these factors and the applicability of the Walsh-Healey Act with its protective features for plant personnel, I see no basis for attributing to Congress the intention to make these contractors "employers" within the meaning of the Fair Labor Standards Act when such a result would have fiscal consequences neither foreseen nor, on any reasonable assumption, desired by Congress. Cf. *United States* v. *Wittek,* 337 U. S. 346. Since the United States is not an "employer" within the meaning of the statute, the overtime provisions are inapplicable.

These considerations call for affirmance without discussion of other grounds which have been advanced for sustaining the judgments below, some of which at least have commended themselves to several Courts of Appeals.